718 F.2d 628
 4 Employee Benefits Ca 2057
 REPUBLIC INDUSTRIES, INC., a Del. Corp., Appellant,
v.
TEAMSTERS JOINT COUNCIL NO. 83 OF VIRGINIA PENSION FUND, an
unincorporated assoc., Appellee.
Pension Benefit Guaranty Corp., Amicus Curiae.
REPUBLIC INDUSTRIES, INC., a Del. Corp., Appellee,
v.
TEAMSTERS JOINT COUNCIL NO. 83 OF VIRGINIA PENSION FUND, an
unincorporated assoc., Appellant.
Pension Benefit Guaranty Corp., Amicus Curiae.
REPUBLIC INDUSTRIES, INC., a Del. Corp., Appellee,
v.
TEAMSTERS JOINT COUNCIL NO. 83 OF VIRGINIA PENSION FUND, an
unincorporated assoc., Appellant.
Pension Benefit Guaranty Corp., Amicus Curiae.
REPUBLIC INDUSTRIES, INC., a Del. Corp., Appellant,
v.
TEAMSTERS JOINT COUNCIL NO. 83 OF VIRGINIA PENSION FUND, an
unincorporated assoc., Appellee.
 Nos. 83-1054, 83-1109, 83-1119 and 83-1196.
 United States Court of Appeals,
Fourth Circuit.
 Argued June 9, 1983.
Decided Sept. 9, 1983.
 
 Lester M. Bridgeman, Washington, D.C. (Louis T. Urbanczyk, Washington, D.C., Philip B. Kurland, John J. Coffey, III, Christopher G. Walsh, Jr., Rothschild, Barry & Myers, Chicago, Ill., on brief), for appellant.
 Paul J. Ondrasik, Jr., Washington, D.C. (Antonia B. Ianniello, Steptoe & Johnson Chartered, Washington, D.C., on brief), for appellee.
 Henry Rose, Gen. Counsel, Baruch A. Fellner, Associate Gen. Counsel, J. Stephen Caflisch, Sp. Counsel, Peter H. Gould, Terence G. Craig, David F. Power, Washington, D.C., on brief, for amicus curiae Pension Ben. Guaranty Corp.
 Before WINTER, Chief Judge, RUSSELL, Circuit Judge, and HAYNSWORTH, Senior Circuit Judge.
 WINTER, Chief Judge:
 
 
 1
 The principal issue in these cross appeals is the constitutionality of the Multiemployer Pension Plan Amendments Act of 1980 (1980 Act), 29 U.S.C. Secs. 1381 et seq., which became effective September 26, 1980 but which provided liability for complete or partial employer withdrawal from a multiemployer pension plan retroactive to April 29, 1980. Sec. 1461(e)(2)(A). The constitutionality of the 1980 Act is attacked on the grounds that the withdrawal provisions, including their retroactive effective date, are arbitrary and irrational, the collection proceedings deprive an employer of an impartial prepayment hearing and the right to trial by jury, the 1980 Act generally impairs pre-existing contract rights, takes property for public use without the payment of just compensation and is void for vagueness. Threshold questions are whether the district court correctly declined to decide an alleged statutory defense which, if it prevailed, would have mooted the constitutional issue, and whether the district court should have stayed decision of the constitutional issues until arbitration was undertaken. Finally there is a question resulting from the district court's ruling on the merits as to whether it was in error in declining to award attorney's fees.
 
 
 2
 The district court ruled that it should pass on the constitutional issues and should remit to later arbitration procedures the statutory defense to plaintiff's liability. It ruled the statute constitutional in all respects, including the retroactive imposition of withdrawal liability. Although defendants thus prevailed, the district court declined to award them attorney's fees.
 
 
 3
 We affirm except with respect to attorney's fees.
 
 I.
 
 4
 We begin with a brief description of the scheme of the 1980 Act. The 1980 Act was an amendment to the then-existing Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. Secs. 1001 et seq., which had been enacted to regulate employee benefit plans so as to protect the interests of participants and their beneficiaries. ERISA had imposed no withdrawal liability on a contributor to a multiemployer plan except when the entire plan terminated within five years of the employer's withdrawal, and even then the employer's liability was limited to 30 percent of the employer's net worth.
 
 
 5
 The 1980 Act regulates employer withdrawals from multiemployer benefit plans.[1] Its basic concept is that each employer, in addition to contributions to the plan pursuant to collective bargaining agreements, owes a share of the unfunded vested liability of the plan to its beneficiaries and the employer must pay that share if he withdraws from the plan even if the plan does not terminate.[2] Although effective generally September 26, 1980, the 1980 Act makes withdrawal liability applicable to any employer on or after April 29, 1980. Sec. 1461(e)(2)(A).
 
 
 6
 When an employer withdraws, the benefit plan's sponsor (here, the Board of Trustees of Teamsters Joint Council No. 83 of Virginia Pension Fund) determines the amount of the employer's withdrawal liability, devises a payment schedule, gives notice to the employer and demands payment. Secs. 1382 and 1399. If the employer disputes either the fact or the amount of its liability, it has the right to negotiate the matter with the plan's sponsor, Sec. 1399(b)(2)(A), and if it is unsuccessful, it (as well as the plan's sponsor) has the right to invoke arbitration. Sec. 1401(a). Either party to arbitration may apply to a district court "to enforce, vacate, or modify the arbitrator's award," but in any such proceeding, there is a statutory presumption that the arbitrator's findings of fact were correct, rebuttable only by a clear preponderance of the evidence. Sec. 1401(b) and (c). Although an employer may seek arbitration and judicial review of the arbitrator's decision, it is statutorily obligated to pay the sponsor's determination of its withdrawal liability no later than sixty days after the initial demand "notwithstanding any request for review or appeal of determinations of the amount of such liability or of the [payment] schedule." Sec. 1399(c)(2).
 
 
 7
 Factually, this case arose in this manner. Plaintiff, Republic Industries, Inc. (Republic), is the successor in interest to Johnson Motor Lines, Inc. (Johnson), an interstate motor carrier of freight.[3] Johnson continued to operate until August 8, 1980, but in November 1979, because of operating losses, it closed its Richmond General Commodities terminal (Hull Street terminal) and transferred some of the employees to another terminal also in Richmond but some eight miles away (Maury Street terminal).[4] Johnson, pursuant to collective bargaining agreements, had obligated itself to make periodic contributions to defendant, Teamsters Joint Council No. 83 of Virginia Pension Fund (Pension Fund), with respect to employees at the Hull Street terminal, as well as contributions to other funds with regard to employees at other terminals.[5] On August 8, 1980, Republic concluded to terminate all of Johnson's operations; Republic acquired Johnson's assets; Johnson was dissolved; and all contributions to the Pension Fund ceased.
 
 
 8
 On July 3, 1981, Pension Fund notified Johnson that its withdrawal liability would be $189,107.00. However, because Sec. 1383(d) makes special provision for the amount and terms of payment of withdrawal liability of "employers primarily engaged in the long and short haul trucking industry" and others, Pension Fund demanded that Republic, instead of payment in full, post security for 50 percent of the amount claimed pending a determination by the Pension Benefit Guaranty Corporation (Guaranty Corporation) of whether Pension Fund's contribution base had been "substantially damaged" as a result of withdrawal.[6] Republic protested, contesting retroactive liability and asserting that liability for employees at the Hull Street terminal closed in 1979 should have been excluded with the result that withdrawal liability would become de minimis. Pension Fund did not accede to this protest and Republic did not seek arbitration. A year later, Pension Fund, because it became uncertain of Republic's right to the special provisions of Sec. 1383, demanded payment in full, stating that it had determined that Pension Fund was not a trucking industry plan.
 
 
 9
 Republic then instituted this action, seeking a declaration that the retroactive withdrawal liability provisions of the 1980 Act are unconstitutional and a permanent injunction restraining Pension Fund from collecting its withdrawal liability claim. Pension Fund was named as defendant. The district court and we permitted Guaranty Corporation to participate in the proceedings as amicus curiae.
 
 
 10
 The district court, on cross-motions for summary judgment, held that the retroactive aspect of withdrawal liability was valid and constitutional. It recognized that, with respect to withdrawal from a multiemployer pension plan, the case was one of first impression. It placed principal reliance on Nachman Corp. v. Pension Benefit Guaranty Corp., 592 F.2d 947 (7 Cir.1979), aff'd on statutory grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), which was a case dealing with withdrawal from a single employer pension plan, because it thought the difference was not distinguishing. The district court concluded that it should decide the case on constitutional grounds, neither deciding it on the statutory ground that the Hull Street terminal was a separate facility from the Maury Street terminal nor requiring resort to arbitration as a condition precedent to the constitutional challenge, because it was of the view that the constitutional challenge was one that went to the very process of arbitration and that arbitration would not moot the constitutional issue. In this connection, after ruling the 1980 Act valid, the district court ruled that arbitration was still available since the pendency of the action tolled any period of limitations on seeking arbitration. Because it understood the law with regard to plaintiff's other constitutional challenges to be well settled in favor of their rejection, the district court did not discuss them. From these rulings, Republic appeals. At a later stage of the proceedings, the district court denied defendant's request for attorney's fees, and from that order defendant appeals.
 
 II.
 
 11
 We consider first whether the district court correctly proceeded to a decision of the constitutional challenges. In the district court, Republic argued that its claim depended entirely upon the meaning of the term "facility" as used in Sec. 1397(a),[7] that the Hull Street terminal was a facility which was permanently closed before April 29, 1980, and that therefore it was entitled to judgment as a matter of law. As part of the argument both there and here Republic invoked the established rule of law that cases should be decided, where possible, on statutory grounds and unnecessary constitutional adjudications avoided. See United States v. Security Industrial Bank, --- U.S. ----, ----, 103 S.Ct. 407, 411, 74 L.Ed.2d 235 (1982).
 
 
 12
 The amicus Guaranty Corporation makes a related argument based upon the familiar principle of exhaustion of available remedies. It contends that the district court should not have proceeded to a constitutional adjudication until after arbitration had been initiated and concluded. See Myers v. Bethlehem Shipbuilding Corporation, 303 U.S. 41, 50-51, 58 S.Ct. 459, 463-464, 82 L.Ed. 638 (1938). Indeed it argues that, absent exhaustion, the district court lacked equity jurisdiction. See Aircraft & Diesel Equipment Corporation v. Hirsch, 331 U.S. 752, 767, 67 S.Ct. 1493, 1500-1501, 91 L.Ed. 1796 (1947). Pension Fund argues, instead, that Republic has lost the right to arbitration on the statutory issue since it failed to seek arbitration within the time prescribed by Sec. 1401(a)(1), and so the constitutional issue is properly reached. It is interesting to note that the arguments of Pension Fund and Guaranty Corporation are in conflict, because a premise of the argument of Pension Fund is that there is no issue for an arbitrator to decide, while a premise of the argument of Guaranty Corporation is that there is an arbitrable issue.
 
 
 13
 We think that the district court correctly proceeded to decide the constitutional issues without addressing Republic's statutory argument. In disagreement with Republic we think that the question of whether the Hull Street terminal was a "facility" within the meaning of Sec. 1397(a) is, at least in part, a factual one which under the 1980 Act must be decided by arbitration. As we have recited, Johnson operated two terminals in Richmond, approximately eight miles apart. The employees at the Hull Street terminal were, from time to time, loaned to the Maury Street facility; and although the Hull Street terminal was closed prior to the crucial date of retroactivity, the Maury Street terminal, to which five of the General Commodity employees were transferred and on whom Republic continued paying contributions to the Pension Fund, was not discontinued until after the crucial date of retroactivity. Pension Fund, by the assertion of Republic's liability, expressly or impliedly took the position, in dispute of that taken by Republic, that the terminal not closed until after April 28, 1980 was a "facility." It seems to us that whether the two terminals represented a Richmond facility or whether the surviving terminal became a covered facility after the five employees who were beneficiaries of a benefit plan were transferred to it is a nice question of fact and law.
 
 
 14
 We have no doubt that the scheme of the 1980 Act is to require such a question to be decided by an arbitrator rather than a court. Section 1401(a)(1) expressly provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan [pertaining to the assessment of withdrawal liability] shall be resolved through arbitration." Section 1401(b)(2) in providing for judicial review conditions the right to review "[u]pon completion of the arbitration proceedings in favor of one of the parties ...." Finally our sister circuit in Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund, 693 F.2d 290, 294 (3 Cir.1982),[8] has stated that the 1980 Act "explicitly mandates the initial resolution of disputes through arbitration ...."
 
 
 15
 We also reject the argument of Guaranty Corporation that the district court should have withheld its constitutional pronouncement until the arbitration remedy was exhausted. This question was extensively considered in Republic Industries, Inc. v. Central Pennsylvania Teamsters Pension Fund, supra, which held that since there, as well as here, Republic mounts a facial challenge to the constitutionality of the 1980 Act and because arbitration could neither moot the constitutional issues which are raised nor develop a factual context for their easy judicial resolution, exhaustion of the remedy of arbitration will not be required as a prerequisite to the exercise of judicial determination. Similarly, in Shelter Framing Corporation v. Pension Benefit Guaranty Corporation, 705 F.2d 1502 (9 Cir.1983), where a constitutional attack on the validity of the retroactive effect of the 1980 Act was sustained and the retroactive feature held unconstitutional, the court rejected the argument of Guaranty Corporation that it should withhold deciding the constitutional issue until after arbitration. The court noted that the arbitration provisions of the 1980 Act were limited to "disputes involving a determination ... [of] the establishment, computation and collection of withdrawal liability." Thus, they do not apply "where the constitutionality of the statute, not the establishment or amount of withdrawal liability, is at issue." Id. at 1509. It also recognized that the expertise of an arbitrator would not go to the constitutional issue and therefore "[a]rbitration would neither develop a better record for adjudication of the constitutional issues nor eliminate the need to consider the constitutional challenge." Id. at 1509. We agree and rest on their authority.
 
 III.
 
 16
 Republic contends that the retroactive effect of the withdrawal liability provisions denies it due process of law, both by impairing pre-existing contractual rights and by violating its right to prior notice and fair warning of governmental regulation.
 
 
 17
 While it is settled that Congress may not legislate retroactively in the field of criminal law, the Constitution does not deny it some authority to do so in order to adjust the burdens and benefits of economic life. The leading authority is Usery v. Turner Elkhorn Mining Co., 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976), in which it was held that the Black Lung Benefits Act of 1972 did not deny due process by requiring coal operators to compensate former employees suffering from pneumoconiosis who terminated their work in the industry before the Act was passed. The Court prescribed as the test for validity the "rationality" of retrospective legislation, pointing out that rationality, i.e., the justification, for prospective legislation may not suffice for retrospective legislation. Specifically with regard to the Act being considered, the Court concluded that "the imposition of liability for the effects of disabilities bred in the past is justified as a rational measure to spread the cost of employees' disabilities to those who have profited from the fruits of their labor--the operators and the coal consumers." Id. at 18, 96 S.Ct. at 2893. The Court rejected the argument that there was a fairer means of spreading the costs, saying "[i]t is enough to say that the Act approaches the problem of cost spreading rationally; whether a broader cost-spreading scheme would have been wiser or more practical under the circumstances is not a question of constitutional dimension." Id. at 19, 96 S.Ct. at 2894. Finally the Court distinguished Railroad Retirement Board v. Alton R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935), a case in which a provision in the Railroad Retirement Act of 1934, requiring employer-financed pensions for former employees who had been employees within the year preceding the time of enactment of the Act, was held invalid. It said that, "[a]ssuming that ... [Alton] retains vitality", Id. 428 U.S. at 19, 96 S.Ct. at 2894, the purpose of the Black Lung Benefits Act was to satisfy a specific need created by the dangerous conditions under which the former employee labored--to allocate to the mine operator an actual, measurable cost of his business, rather than to "supplement a former employee's salary to meet his generalized need for funds." Id. at 19, 96 S.Ct. at 2894.
 
 
 18
 The principles of Usery have been applied by two courts of appeals to two provisions of ERISA which impose retroactive liability for the payment of unfunded, vested benefits upon an employer who withdraws from a pension plan. In Nachman Corporation v. Pension Benefit Guaranty Corporation, 592 F.2d 947 (7 Cir.1979), aff'd on stat. grounds, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), the Seventh Circuit ruled on the constitutionality of the provision of ERISA relating to the termination of a single employer pension fund.[9] Nachman's collective bargaining agreement permitted it to terminate its pension plan; and although the plan purported to guarantee fixed benefits for each year of service, the agreement provided that in the event of termination the fund would pay benefits only to the extent of its assets without liability on the part of Nachman for vested but unfunded benefits. Nachman terminated its plan after the enactment of ERISA and at a time when the assets of the fund could satisfy only 35 percent of accrued vested benefits. ERISA, inter alia, created Guaranty Corporation which guaranteed the payment of nonforfeitable benefits and which had the right to recover amounts it paid under its guaranty from the employer who sponsored the plan. Thus ERISA required Nachman to fund retroactively unfunded, vested benefits.
 
 
 19
 The Seventh Circuit sustained the constitutionality of this provision of ERISA. After reciting Usery's requirement of "rationality", the court said:
 
 
 20
 Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected, ... whether the impairment of the private interest is effected in an area previously subjected to regulatory control, ... the equities of imposing the legislative burdens, ... and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens.
 
 
 21
 Id. 592 F.2d 1 at 960 (citations omitted). With respect to these factors, the court identified the loss by workers of vested pension benefits due to plan terminations as a widespread problem of national importance. Congress was confronted with evidence that approximately 20,000 workers lost benefits each year for that reason. The court thought that the reliance of employees on their vested pension benefits outweighed the employers' reliance on a limited funding obligation; it noticed that federal tax laws had imposed some regulation on employee pension plans; and it thought it equitable for an employer who has received the full benefit of its employees' services to pay for the pension promised them. Finally, it relied on the provisions of ERISA modifying the employer's liability, i.e., net worth limitations on liability, the right to insure against this contingent liability and Guaranty Corporation's authority to arrange reasonable terms for the payment of liability.
 
 
 22
 Shelter Framing Corporation v. Pension Benefit Guaranty Corporation, 705 F.2d 1502 (9 Cir.1983), dealing with the same retrospective provision of the 1980 Act which is before us in the present case, reached the opposite result. There, Shelter, G & R Roofing Company and R.A. Gray & Co., respectively, contributors to multiemployer pension plans, each withdrew from the pension fund to which it had been obligated to make payments prior to the effective date of the 1980 Act but after April 29, 1980, and each was assessed for withdrawal liability. Applying the analytical framework established by Nachman, the Ninth Circuit held the retroactive aspect of the 1980 Act unconstitutional. It thought that employer reliance on nonliability outweighed employee reliance on vested rights, particularly when the employers in the cases before it withdrew before enactment of the 1980 Act. With regard to employee reliance, the court reasoned that reliance was on the plan itself and not the contribution of any particular employer. Although the court recognized that pension plans have been subject to regulation at least since 1974 when ERISA was enacted, and that the fact of prior regulation "weighs in favor of retroactive application," it concluded that the "unduly harsh degree" of impairment of the employers' reliance interests by the 1980 Act still rendered it invalid. Id. at p. 1512. In weighing the equities, the Ninth Circuit concluded that the equities weighed against retroactive application of the 1980 Act, largely because, for employers who withdrew in the period between April 29, 1980 and September 26, 1980, the withdrawal liability "may" be disproportionate to the specific needs of the pension trust funds. Finally in discussing moderating provisions,[10] the Ninth Circuit found them largely ineffective. The difference in the efficacy of the moderating provisions contained in ERISA and those in the 1980 Act was the principal ground on which Nachman was distinguished.[11]
 
 
 23
 Applying the Nachman frame of analysis, we, with due respect to the views of the Ninth Circuit, conclude that the retrospective withdrawal liability feature of the 1980 Act is constitutional.
 
 
 24
 The problem that the 1980 Act addressed was how to protect the financial stability of multiemployer pension funds more particularly described in Peick v. Pension Benefit Guaranty Corporation, 539 F.Supp. 1025, 1029-34 (N.D.Ill.1982). Briefly stated, the genesis of the 1980 Act was a report of Guaranty Corporation which described its potential liability under the proposals then pending to make it a mandatory insurer of multiemployer pension funds. The report not only confirmed the pressing need for such insurance, it called attention to the incentive that such insurance would provide either to terminate a plan or to discourage employer joinder in a multiemployer plan. Thus Congress was well aware that in its commendable effort to make certain that employees ultimately realize their vested benefits it was necessary to take measures to deal with withdrawal liability lest it exacerbate the problems of financially weak plans and encourage withdrawals from and terminations of plans in financial distress. The problem was met by imposing retroactive withdrawal liability. Significantly the date of retroactivity was advanced from February 27, 1979, as prescribed in the bill as introduced, to April 29, 1980, as prescribed in the bill as enacted. See, Peick, 539 F.Supp. at 1053.
 
 
 25
 We think that the Congressional response to the problem was a rational one. It is not our function to say that it was the best one. We have no doubt of the heavy weight to be given to employees' reliance on ultimate realization of their vested benefits. Conversely, Republic's reliance on its unqualified right to withdraw from a multiemployer pension plan is not as weighty. As the legislative history of the 1980 Act shows, by the effective date of the Act, April 29, 1980, two House Committees had reported out bills imposing withdrawal liability retroactively to withdrawals occurring after February 27, 1979.[12] By the time that Republic closed its facility on August 8, 1980, the House had unanimously passed the bill, and the Senate had passed a substantially similar bill which advanced the effective date to April 29, 1980. Thus Republic had fair notice of its potential liability. In this regard retroactive legislation was held valid in United States v. Darusmont, 449 U.S. 292, 299, 101 S.Ct. 549, 553, 66 L.Ed.2d 513 (1981) (per curiam), and United States v. Hudson, 299 U.S. 498, 57 S.Ct. 309, 81 L.Ed. 370 (1937), where pre-enactment events gave an affected party fair notice of the act. Republic suggests that these cases are sui generis, but it offers no persuasive reasoning why this is so or why they are inapplicable here.
 
 
 26
 We agree with the Ninth Circuit for the reasons assigned by it that the Nachman factor of prior regulation is fully satisfied. Additionally we would add--and perhaps this goes as much to Republic's reliance on nonliability for withdrawal--that since the enactment of ERISA, termination of single employer pension funds has been fully regulated and regulation of withdrawal from multiemployer pension funds was only postponed because of Congressional caution about the best way to approach the problem. See Peick, 539 F.Supp. at 1030-31.
 
 
 27
 The balance of equities of the parties, to our minds, weighs heavily in favor of the employees. We can add little to the discussion of the equities contained in Peick, 539 F.Supp. at 1046-52. We say only that Congress was met with the need to ensure financial stability of multiemployer pension plans when withdrawals occurred, as well as to create disincentives for employers to abandon such plans. Confronted with the choice of who should bear the economic burden of unfunded pension liability left by withdrawing employers, Congress did not in our view act inequitably in requiring that employers who received the full benefit of their employees' services should bear the cost rather than the employees who provided their services on the actual or implied promise that they would ultimately enjoy their vested, accrued pension benefits.
 
 
 28
 In finding the retroactive imposition of withdrawal liability to be unnecessary to protect a worker's right to vested benefits, the Ninth Circuit placed great emphasis on the ability of the employers who remain in a plan to fund those payments. Therein it found a basis to distinguish the single-employer plan provisions at issue in Nachman. However, Congress expressly confronted this issue and concluded that while shifting liability to the remaining employers might preserve workers' benefits it would also create an incentive for those employers to withdraw to avoid being saddled with the liability. As the district court noted, in Peick, it was the fear of such a wave of opportunistic withdrawals prior to the effective date of the 1980 Act which led Congress to impose liability retroactively. Id. at 1055. This legislative judgment is, in our view, not an irrational one.
 
 
 29
 Congress did ameliorate the substantial impact of withdrawal liability as recognized by the Ninth Circuit. See n. 10, supra. In addition, as moderating factors, the 1980 Act ensures that an employer's liability will be proportionate to its past annual contributions. Sec. 1399(c)(1)(C). It provides that withdrawal does not generally occur when an employer ceases covered operations or ceases to contribute as a result of a bona fide sale of assets to an unrelated party which assumes the obligation to continue contributions. Sec. 1384. Nor does an employer's change in corporate structure or change to an unincorporated form of business enterprise constitute a withdrawal if the successor continues to contribute to the plan. Sec. 1398(1). A withdrawal does not occur solely because an employer suspends contributions during a labor dispute involving its employees. Sec. 1398(2). Finally, with respect to certain industries, an employer is excused from withdrawal liability if the plan's contribution base will not be harmed by the withdrawal. Sec. 1383.
 
 
 30
 In summary, therefore, we think that the Nachman analysis is the proper one to apply; and when we apply it, we are led to conclude that the provisions of the 1980 Act for retroactive withdrawal liability are valid and constitutional.
 
 IV.
 
 31
 We turn now to Republic's contentions that the 1980 Act is unconstitutional for other reasons. The grounds asserted are that (1) the 1980 Act deprives Republic of its right to an impartial prepayment hearing, (2) it abrogates the right to trial by jury, (3) it impairs pre-existing contract rights, (4) it takes property for public use without payment of just compensation, and (5) it is void for vagueness. We consider them seriatim.
 
 
 32
 A. Alleged Denial of Procedural Due Process.
 
 
 33
 Republic's argument is that compulsory arbitration is invalid; but even if it is not, the dispute resolution mechanism of the 1980 Act is constitutionally defective because it is not fair and impartial, because the presumptions of correctness of the arbitrator's decision and the statutory burden of proof to overcome it convert judicial review into pro forma review rather than a de novo determination, and because payment of withdrawal liability is required pending arbitration and judicial review, all to the end that Republic is denied procedural due process of law.
 
 
 34
 We begin our discussion with recognition that a determination of whether due process is satisfied requires us to balance the government's interest in utilizing the challenged procedures, the risk of error inherent in those procedures and the private interests that will be affected by the challenged procedures. Mathews v. Eldridge, 424 U.S. 319, 334-35, 96 S.Ct. 893, 902-903, 47 L.Ed.2d 18 (1976). We are mindful that "due process is flexible and calls for such procedural protections as the particular situation demands." Morrissey v. Brewer, 408 U.S. 471, 481, 92 S.Ct. 2593, 2600, 33 L.Ed.2d 484 (1972).
 
 
 35
 First, we think it too late in the day to argue that compulsory arbitration, per se, denies due process of law. The cases holding unconstitutional the delegation of adjudicating authority to private parties have all done so on the ground that the parties to whom the delegation is made lack the impartiality and objectivity which due process requires. See Washington ex rel. Seattle Title Trust Co. v. Roberge, 278 U.S. 116, 49 S.Ct. 50, 73 L.Ed. 210 (1928); Eubank v. City of Richmond, 226 U.S. 137, 33 S.Ct. 76, 57 L.Ed. 156 (1912). Delegation of adjudicatory authority to an impartial arbitrator does not suffer from this infirmity. Indeed the Supreme Court, without discussion of the constitutional implications, has frequently enforced the provisions of the Railway Labor Act requiring binding arbitration of certain railroad labor disputes. See Andrews v. Louisville & N.R.R., 406 U.S. 320, 322, 92 S.Ct. 1562, 1564, 32 L.Ed.2d 95 (1972), and cases cited therein. Congress may require arbitration so long as fair procedures are provided and ultimate judicial review is available. Thus we proceed to a consideration of Republic's assertions of unfairness in the dispute resolution mechanism.
 
 
 36
 We do not think that Republic has shown there is institutional bias on the part of the trustees of Guaranty Corporation who make the initial determination of the amount of withdrawal liability. Collectively, there are an equal number of trustees chosen by participating unions and participating employers. 29 U.S.C. Sec. 186(c)(5)(B). But we reject the argument that they have an inherent bias in making overly liberal assessments of withdrawal liability so to favor employees and lessen the financial burden on employers who remain as participants in the plan. They are fiduciaries and are required to act as such. That they are selected by entities which have an interest in protecting the fund which they administer does not per se deny due process. Friedman v. Rogers, 440 U.S. 1, 17-18, 99 S.Ct. 887, 898, 59 L.Ed.2d 100 (1979); First Jersey Securities v. Bergen, 605 F.2d 690 (3 Cir.1979); Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937 (2 Cir.1974). As was pointed out in Lopez, to forbid tribunals composed of individuals drawn from organizations interested in the matter being regulated on the ground of such interest would deny the tribunal valuable, and perhaps otherwise unavailable, expertise.[13]
 
 
 37
 Moreover, the trustees do not act with unbridled discretion. By statute, the method of computing the unfunded vested liability of a plan is prescribed, Sec. 1391, and it is phrased in such language that an actuary must be employed. In addition, Guaranty Corporation may prescribe actuarial assumptions upon which unfunded vested benefits are determined as the first step in determining an employer's withdrawal liability. Sec. 1393.
 
 
 38
 In making factual determinations such as, for example, whether Republic's Maury Street terminal became a "facility" after the Hull Street terminal was closed, as well as the amount of an employer's withdrawal liability, a decision of the trustees is subject to arbitration, and the decision of the arbitrator, to judicial review. We reject Republic's argument that such review is essentially meaningless. It is true that the 1980 Act makes the trustees' decisions presumptively correct, Sec. 1401(a)(3)(A), and provides that the decision of the arbitrator is also presumptively correct and may be rebutted only by a clear preponderance of the evidence. Sec. 1401(c). Read together, however, these provisions do little more than allocate the burden of proof to the challenger and direct that issues which are close be resolved in favor of the nonjudicial dispute resolver. In this we perceive no evident unfairness.[14]
 
 
 39
 We do not think, as Republic argues, that an employer cannot obtain effective judicial review of an arbitrator's legal rulings. It is true that Sec. 1401(b)(3) provides that any arbitration proceedings shall "to the extent consistent with [the 1980 Act]" be conducted subject to the same limitations, carried out with the same powers, and enforced in United States Courts, as arbitration proceedings carried out under 9 U.S.C. Secs. 1 et seq., and that 9 U.S.C. Sec. 10 prohibits judicial review of legal or factual disputes voluntarily submitted to an arbitrator. The clear authorization of Sec. 1401(b)(2) for judicial review "to enforce, vacate, or modify the arbitrator's award" gives a right to review an arbitrator's legal rulings. Since 9 U.S.C. Sec. 10 is not consistent with Sec. 1401(b)(2), the latter prevails.
 
 
 40
 Finally, we consider whether the provisions of the 1980 Act with respect to payment of withdrawal liability pending review by the trustees of the plan or pending arbitration deny due process of law.[15] There is an ambiguity in the 1980 Act as to how much Republic must pay pending reconsideration arising out of the meaning of Sec. 1401(d).[16] Depending upon how the 1980 Act is read, Republic may be required to make installment payments as they come due in order to avoid a default, which would have the effect of accelerating its total liability, or it may not be required to pay anything while it exercises its right to review or arbitration. We need not resolve this issue in this appeal, because even if we assume that Republic must make periodic payments as they become due and owing, it would not be denied due process. In all but the most prolonged proceedings, we cannot perceive how payment of the periodic installments as they become due and owing could constitute a crushing economic burden on Republic.[17] Indeed, an employer's annual liability is calculated so that it will bear a rough relation to its past contributions, Sec. 1399(c)(1)(C). Since Republic has the right to contest the assessment and since it will receive credit for any overpayment arising out of the decision of the arbitrator, Sec. 1401(d), or as modified by a court, Sec. 1401(b)(2), we cannot say that Congress has denied due process in striking a balance between the competing interests of the pension fund and the employer. See Mitchell v. W.T. Grant Co., 416 U.S. 600, 94 S.Ct. 1895, 40 L.Ed.2d 406 (1974). Finberg v. Sullivan, 634 F.2d 50 (3 Cir.1980) (in banc).
 
 
 41
 B. Alleged Denial of Right to Jury Trial.
 
 
 42
 We do not think that Republic has been denied a right to a jury trial. Such a right is only with respect to suits which existed at common law, Atlas Roofing Co. v. OSHA, 430 U.S. 442, 458, 97 S.Ct. 1261, 1270, 51 L.Ed.2d 464 (1977); this is not such a case. More is involved than a dispute between Republic and the Fund. Ultimately, liability for unfunded vested rights to benefits will fall on Guaranty Corporation, a public body representing the public interest. NLRB v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893 (1937), makes it clear that Congress may constitutionally enact a statutory remedy, unknown at common law, vesting factfinding in an administrative agency or others without the need for a jury trial.
 
 
 43
 C. Alleged Impairment of Contract Rights.
 
 
 44
 Because the 1980 Act would impose on Republic an obligation to pay for vested, unfunded benefits when it withdrew from a multiemployer pension plan, notwithstanding that its collective bargaining contract imposed no such liability, Republic argues that its vested contractual rights have been unconstitutionally impaired. Principal reliance is put on Railroad Retirement Board v. Alton R.R. Co., 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935) and Allied Structural Steel Co. v. Spannaus, 438 U.S. 234, 98 S.Ct. 2716, 57 L.Ed.2d 727 (1978).
 
 
 45
 Usery v. Turner Elkhorn Mining Co., supra, answers this contention. There, it was said, that if Alton retains vitality it is distinguishable because in Alton the purpose of the legislation was to supplement a former employee's salary, while in Usery the statute was to provide compensation for injuries sustained during employment. Similarly in the instant case, the object of the 1980 Act is to fund benefits which accrued and vested during the employees' period of employment. Like the district court, we also subscribe to the views expressed in Nachman Corp. v. Pension Benefit Guaranty Corporation, 592 F.2d at 962. We conclude that this contention is lacking in merit.
 
 
 46
 D. Alleged Taking of Property.
 
 
 47
 While it is questionable if Republic may argue here that its property has been "taken" without "just compensation" as the Fifth Amendment requires because it is not clear if this issue was raised in the district court, the argument is foreclosed by Penn Central Transp. Co. v. New York City, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). There it was recognized that government regulation which shifts the benefits and burdens of economic life to promote the common good is not a "taking" for which compensation must be provided.
 
 
 48
 E. Alleged Unconstitutional Vagueness.
 
 
 49
 Republic contends that there is unconstitutional vagueness in the 1980 Act in two respects. First, it faults Sec. 1383(d)(2), the so-called "trucking industry" exemption, which permits a member of that industry to avoid payment of withdrawal liability by posting a security bond pending a determination if the plan has suffered "substantial damage" by that employer's withdrawal. The exemption is extended to plans where "substantially all of the contributions under the plan are made by employers primarily engaged in the long and short haul trucking business, etc."[18] Its argument is that "substantially all" is undefined, as is "employers" in those instances where a parent company has a wholly-owned operating subsidiary.
 
 
 50
 Second, Republic excepts to the language of Sec. 1393(a) giving Guaranty Corporation the authority to prescribe "actuarial assumptions" to be used for computing employer withdrawal liability at least where the plan itself does not prescribe the actuarial assumptions to be made. Although Sec. 1393(a) does specify that the actuarial assumptions to be prescribed by Guaranty Corporation must be "reasonable", Sec. 1393(a)(1), Republic argues that the language is so vague and inexact that the plan's trustees have unlimited and unbridled discretion to fix withdrawal liability.
 
 
 51
 We do not think that the language of the 1980 Act is impermissibly vague in either respect. The 1980 Act is a form of economic regulation and it does not impinge upon conduct which is constitutionally protected, such as the exercise of free speech. "[E]conomic regulation is subject to a less strict vagueness test because its subject matter is often more narrow [then regulation reaching protected conduct], and because businesses, which face economic demands to plan behavior carefully, can be expected to consult relevant legislation in advance of action. Indeed, the regulated enterprise may have the ability to clarify the meaning by its own inquiry, or by resort to administrative process," Village of Hoffman Estates v. Flipside, Hoffman Estates, 455 U.S. 489, 498, 102 S.Ct. 1186, 1193, 71 L.Ed.2d 362 (1982). Moreover, where the statute does not regulate protected conduct, it may not be set aside as unconstitutionally vague unless it is "demonstrate[d] that the law is impermissibly vague in all of its applications." Id. at 497, 102 S.Ct. at 1193.
 
 
 52
 Thus the fact that the word "substantial" and the term "employers primarily engaged" in certain activities may be imprecise in certain fact situations does not make them impermissibly vague since they are quite clear in the majority of fact situations to which they apply. By and large their meaning may be discerned in most cases in which they are in issue both from the language employed and the legislative history of the 1980 Act.[19] Moreover there is authority that "substantial" is a term not so vague as to be invalid. See Joseph E. Seagram & Sons v. Hostetter, 384 U.S. 35, 48-49, 86 S.Ct. 1254, 1262, 1263, 16 L.Ed.2d 336 (1966). Similarly, we do not think that the phrase "reasonable actuarial assumptions" is so lacking in meaning as to be invalid.
 
 V.
 
 53
 After the district court sustained the constitutionality of the 1980 Act, it entered an order remitting the issue of whether the Hull Street terminal was a "facility at which all covered operations permanently ceased before April 29, 1980" to arbitration, adjudging that Republic had sixty days from the date of the order to initiate arbitration.
 
 
 54
 The pension plan defendants challenge the correctness of this ruling. They argue that under Sec. 1401(a)(1)(B), Republic had 120 days from July 9, 1980, the date of notice of its withdrawal liability, to request arbitration and that failing to do so, its right to request arbitration is barred.
 
 
 55
 This suit was filed October 5, 1980. In agreement with the district court, we think that the filing of suit tolled the period of limitations set forth in Sec. 1401(a)(1)(B). Statutory time frames may be tolled where equitable considerations justify their suspension. See Burnett v. New York Cent. R. Co., 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). We think it equitable that when Republic has made a not frivolous challenge to the constitutionality of the arbitration procedures, the validity of which has not heretofore been definitively decided, the pendency of the litigation should toll the running of the period prescribed in Sec. 1401(a)(1)(B).
 
 VI.
 
 56
 Finally, we consider the cross appeal by Pension Plan from the district court's denial of its motion for attorney's fees under Sec. 1451(e). After judgment was entered in its favor in Republic's action challenging the constitutionality of the 1980 Act, Pension Plan moved for attorney's fees under Sec. 1451(e). That section states: "(i)n any action under this section, the court may award all or a portion of the costs and expenses incurred in connection with such action to the prevailing party." The district court denied the motion, reasoning that Republic's constitutional challenge to the 1980 Act, and therefore Pension Fund's defense of that challenge, was not an action under Sec. 1451. The Ninth Circuit has since held otherwise, granting attorney's fees upon a successful challenge to the constitutionality of the Act. Shelter Framing Corp., 705 F.2d at 1515. We agree with its conclusion that a constitutional challenge to the imposition of withdrawal liability is brought under Sec. 1451 for Sec. 1451(a) broadly defines the range of actions which may be brought thereunder as including any action brought by a person "adversely affected by the act ... of any party under this subtitle with respect to a multiemployer plan" to seek legal or equitable relief.
 
 
 57
 Thus, we reverse the district court's denial of attorney's fees and remand the claim for fees to it so that it may exercise its discretion as to whether to grant fees under Sec. 1451(e).
 
 
 58
 AFFIRMED IN PART; REVERSED AND REMANDED IN PART.
 
 
 
 [1]
 As the brief of Republic Industries, Inc. explains, multiemployer funds predominate in industries typified by small employers, systems of shifting work sites and "portability" of employment, such as the construction, mining, entertainment and motor carrier industries. The multiemployer character of the fund permits employees to accumulate pension credits even while shifting employment from one employer to another, and protects their pension rights from being lost by the "withdrawal" of any particular employer. The multiemployer character of the fund also protects the solvency of the fund because the impact on the fund from the "withdrawal" of any particular employer is minimized; and when new entrants take the place of withdrawing employers, the pool is replenished
 
 
 [2]
 Unfunded vested liability, Republic asserts, can result from a number of factors. First, contributions are set by the collective bargaining process while benefits are prescribed by the fund's trustees who are independent of the employer. There is not always correlation between them so that contributions may be inadequate. Second, many funds predate ERISA and the vesting requirements of ERISA may be more stringent and increase unfunded vested liability. Third, increases in benefits for employees with credit for past service for which no employer contribution was made increase unfunded vested liability. Fourth, the assets of the fund may diminish as a result of market forces, general economic conditions or imprudent investment. Fifth, actuarial assumptions on which unfunded vested liability is premised may be modified
 
 
 [3]
 Republic purchased all of Johnson's stock in June 1979
 
 
 [4]
 There is evidence that even before the transfer employees of the terminal were used, from time to time, to perform services at the other facility
 
 
 [5]
 At issue in this case is Republic's asserted withdrawal liability of approximately $189,000 with respect to the employees formerly at the Richmond General Commodities terminal. Republic asserts that its combined asserted withdrawal liability to other funds for other employees exceeds $19,000,000. The other claims are in litigation before other courts but no suit has been decided on its merits by an appellate court
 
 
 [6]
 Pension Benefit Guaranty Corporation is a government corporation created by 29 U.S.C. Sec. 1302 to insure pension benefits, inter alia, of multiemployer benefit plans and to enforce, inter alia, the withdrawal liability provisions of the 1980 Act. 29 U.S.C. Sec. 1322a. With respect to certain industries, including long and short haul trucking, the corporation may require a bond or escrow account from an employer purporting to withdraw pending a determination of whether the withdrawal has resulted in "substantial damage to the contribution base of the plan." If the determination is affirmative, the employer's obligation to pay becomes operative, but if the determination is in the negative, the bond is cancelled or the escrow refunded without further liability on the employer
 
 
 [7]
 The pertinent portions of the statute are:
 Sec. 1397. Application of part in case of certain pre-1980 withdrawals; adjustment of covered plan.
 (a) For the purpose of determining the amount of unfunded vested benefits allocable to an employer for a partial or complete withdrawal from a plan which occurs after April 28, 1980, and for the purpose of determining whether there has been a partial withdrawal after such date, the amount of contributions, and the number of contribution base units, of such employer properly allocable--
 ....
 (2) to work performed at a facility at which all covered operations permanently ceased before April 29, 1980, or for which there was a permanent cessation of the obligation to contribute before that date,
 shall not be taken into account.
 
 
 [8]
 This case is one of the proceedings in which plaintiff here is challenging its alleged withdrawal liability assessed in another jurisdiction
 
 
 [9]
 Although the Supreme Court affirmed the Seventh Circuit's judgment on statutory grounds, the Supreme Court's judgment has been considered by many courts to be a sub silentio affirmance of the constitutional aspect of Nachman. See, e.g., A-T-O, Inc. v. Pension Benefit Guaranty Corp., 634 F.2d 1013, 1024 (6 Cir.1980); Pension Benefit Guaranty Corp. v. Ouimet Corp., 630 F.2d 4, 12 (1 Cir.1980), cert. denied, 450 U.S. 914, 101 S.Ct. 1356, 67 L.Ed.2d 339 (1981); Peick v. Pension Benefit Guaranty Corp., 539 F.Supp. 1025 (N.D.Ill.1982)
 
 
 [10]
 The moderating provisions with regard to withdrawal liability noticed by the Ninth Circuit may be summarized as follows: a mandatory "de minimis" exemption excuses all liability under $50,000.00, Sec. 1389(a); the trustees of the pension plan may grant a higher exemption, Sec. 1389(b); withdrawal liability is payable over a period of time, Sec. 1399(c)(1); liability is limited to the first twenty annual payments if more than twenty years is needed to amortize the employer's liability, Sec. 1399(c)(1)(B); liability is reduced if the employer withdraws because it liquidates or dissolves its business, Sec. 1405. As we shall show, we think that there are others
 
 
 [11]
 Among district courts, the numerical weight of authority supports the constitutionality of the 1980 Act. See Pacific Iron & Metal Co. v. Western Conf. of Teamsters Pension Trust Fund, 553 F.Supp. 523 (W.D.Wash.1982); Coronet Dodge, Inc. v. Speckmann, 553 F.Supp. 518 (E.D.Mo.1982); Fur Manufacturing Industry Retirement Fund v. Lazar-Wisotzky, Inc., 550 F.Supp. 35 (S.D.N.Y.1982); R.A. Gray & Co. v. Oregon-Washington Carpenters Employers Pension Trust Fund, 549 F.Supp. 531 (D.Or.1982), rev'd, 705 F.2d 1502 (9 Cir.1983); Textile Workers Pension Fund v. Standard Dye Co., 549 F.Supp. 404 (S.D.N.Y.1982); Peick v. PBGC, 539 F.Supp. 1025 (N.D.Ill.1982). There are also numerous unreported decisions to the same effect holding MPPAA constitutional. But there are cases holding the 1980 Act unconstitutional. See Shelter Framing Corp. v. Carpenters Pension Trust, 543 F.Supp. 1234 (C.D.Cal.1982), affd, 705 F.2d 1502 (9 Cir.1983); Republic Industries, Inc. v. New England Teamsters and Trucking Pension Fund, No. 81-2551-S (D.Mass. Aug. 3, 1983); Sibley, Lindsey & Carr Co. v. Bakery, Confectionary & Tobacco Worker's Int'l Union, C-82-555T (W.D.N.Y. Mar. 16, 1983)
 
 
 [12]
 The House Education and Labor Committee reported on April 3, 1980. H.R.Rep. No. 869(I), 96th Cong.2d Sess., reprinted in [1980] U.S.Code Cong. & Ad.News 2918, 2940-2954. The House Ways and Means Committee reported on April 23, 1980. H.R.Rep. No. 869(II), 96th Cong.2d Sess., reprinted in [1980] U.S.Code Cong. and Ad.News. 2992, 3005-3020
 
 
 [13]
 The allegations of trustee bias are little more than "generalized assumptions of possible interest" unsupported by any evidence other than a description of the institutional role of the trustees. As the Supreme Court noted in Schweiker v. McClure, 456 U.S. 188, 196 n. 10, 102 S.Ct. 1665, 1670 n. 10, 72 L.Ed.2d 1 (1982), "(s)uch assertions require substantiation before they can provide a foundation for invalidating an Act of Congress."
 This case is unlike Ward v. Village of Monroeville, 409 U.S. 57, 93 S.Ct. 80, 34 L.Ed.2d 267 (1972), where the Supreme Court held it violative of due process for a mayor of the village to adjudicate traffic offenses and administer fines since those fines were a major source of income to his community. The "possible temptation" was greater in Ward, 409 U.S. at 60, 93 S.Ct. at 83, since the fines represented over one-third of the village's income and were apparently irreplaceable. Here liability assessments are only a small portion of the Fund's total income. Second, employment of the mayor as judge was not claimed to serve any particular interest in Ward. Here, by utilizing the trustees, informed decisionmaking on fairly specialized issues is ensured. Finally, the role played by the mayor in Ward was purely adjudicative in nature. Here the trustees play a mixed role since much, but admittedly not all, of their task is ministerial in nature. For example, in the allocation of a withdrawing employer's proportionate share of the plan's unfunded vested benefit liability the trustees' task is limited to mechanically applying the plan's rule of apportionment to the actuary's determination of its total liability.
 
 
 [14]
 The amicus brief of Guaranty Corporation cites several cases in which an employer has prevailed in arbitration
 
 
 [15]
 29 U.S.C. Sec. 1399(c)(2) requires that payments be commenced within sixty days after the date of demand by the plan sponsor. 29 U.S.C. Sec. 1399(c)(5)(A) permits the plan sponsor to treat nonpayment as default if it is not cured within sixty days after it notifies the employer of its failure to pay. The amount of the annual payment is calculated under Sec. 1399(c)(1)(C): it is the product of the employer's highest contribution rate in the last ten years and the average number of contribution base units for the three consecutive years during that period in which the average is greatest. Payments are made over the period necessary to amortize fully the liability, but not to exceed twenty years. Here a payment period of thirty-eight months is anticipated
 
 
 [16]
 Section 1401(d) provides:
 Payments shall be made by an employer in accordance with the determinations made under this part [29 U.S.C. Secs. 1391 et seq.] until the arbitrator issues a final decision with respect to the determination submitted for arbitration, with any necessary adjustments in subsequent payments for overpayments or underpayments arising out of the decision of the arbitrator with respect to the determination. If the employer fails to make timely payment in accordance with such final decision, the employer shall be treated as being delinquent in the making of a contribution required under the plan (within the meaning of section 515).
 The first sentence plainly requires that installment payments be made pending the arbitrator's final decision. The second sentence, however, apparently contemplates that it is the failure to render payments upon that final decision which constitutes default. That installment payments must be made pending arbitration is further suggested by Sec. 1399(c)(2), which states:
 Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.
 However, apparently to the contrary is Sec. 1401(b)(1) which implies that requested sums are not due while arbitration is pending. It states:
 If no arbitration proceeding has been initiated pursuant to subsection (a), the amounts demanded under section [1399(b)(1) ] shall be due and owing on the schedule set forth by the plan sponsor.
 
 
 [17]
 Republic's liability has been assessed at $189,107.00, payable in equal monthly installments over thirty-eight months. A monthly installment is thus $5,651.00
 
 
 [18]
 Emphasis is added to the words on which Republic relies
 
 
 [19]
 As pointed out in Peick v. Pension Benefit Guaranty Corporation, 539 F.Supp. at 1060-61, the legislative history of the 1980 Act indicates that Congress intended the trucking industry exemption to apply to plans in which at least 85 percent of the contributors were employers contained in the trucking industry