**TRANSPORT MOTOR EXPRESS, INC., E.W. Bohren Transport, Inc., and Essex Group, Inc., Plaintiffs-Appellants,**

v.

**CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, Defendant-Appellee.**

No. 83–2026.

United States Court of Appeals, Seventh Circuit.

Argued Aug. 10, 1983.

Decided Dec. 19, 1983.

Harris Weinstein, Covington & Burling, Washington, D.C., for plaintiffs-appellants.

Robert C. Christenson, Coghlan, Joyce, Nellis & Kelly, Chicago, Ill., for defendant-appellee.

Baruch A. Fellner, Pension Benefit Guaranty Corp., Washington, D.C., for amicus curiae.

Before CUDAHY and ESCHBACH, Circuit Judges, and SWYGERT, Senior Circuit Judge.

CUDAHY, Circuit Judge.

In this expedited appeal,[1] we are asked to consider the constitutionality of various provisions of the Multiemployer Pension Plan Amendment Act of 1980 (the "MPPAA"). Appellants contend that the withdrawal liability provisions of the MPPAA, allegedly as applied in a retroactive manner to them, violate the due process and takings clauses of the fifth amendment and that the procedures established by the MPPAA for contesting and paying this liability violate various other constitutional provisions. Because the district court reached the constitutional issues without ruling on appellants' potentially dispositive statutory contentions, we remand the case to the district court to determine whether the constitutional issues need be reached at all.

I

This action was initiated by two interstate motor common carriers of freight, Transport Motor Express, Inc. ("Transport") and E.W. Bohren Transport, Inc. ("Bohren") and their parent company, the Essex Group, Inc. ("Essex" or the "Essex Group"). Bohren was wholly owned by the Essex Group, which, in turn, is a wholly-owned subsidiary of the United Technologies Corporation. In 1979, Transport employed approximately 1,100 people, about 900 of whom were represented by the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America (the "Teamsters"). In 1979, Bohren employed approximately 90 people, all of whom were represented by the Teamsters. The defendant-appellee, Central States, Southeast and Southwest Areas Pension Fund (the "Central States Fund") is a multiemployer pension plan with approximately 425,000 participants, assets in 1979 of more than $2.4 billion, and income in 1979 of more than $780 million. Pursuant to their labor agreements with the Teamsters, Transport and Bohren were required to contribute a fixed amount per week per covered employee to the Central States Fund so long as these companies employed permanent employees represented by the Teamsters.

A decision was made by the management of Transport and Bohren to terminate business operations and liquidate both companies on April 24, 1980. On April 25 and 26, 1980, substantially all employees of Transport and Bohren were dismissed. A small number of employees, including some represented by the Teamsters, remained on a temporary basis to assist in the closing of the business. By the end of May 1980, all remaining employees represented by the teamsters were dismissed.[2]

The assets of the business were sold in a series of transactions starting on April 27, 1980. The total proceeds of liquidation as of June 25, 1981, were approximately $11.8 million. Approximately $3.2 million remained after payment of liabilities through that date, although additional liabilities remained to be paid.

The MPPAA, which was signed into law by the President on September 26, 1980, was, by its own terms, made retroactive with respect to the imposition of withdrawal liability to April 29, 1980. This created a "retrospective period" of 150 days. Relying on the MPPAA, the Central States Fund assessed a withdrawal liability against Transport (and Essex) for $8,071,885.29 and against Bohren for $563,007.14. These sums represented allocated shares of the Central States Fund's unfunded vested benefits ("UVB") as of December 31, 1979. The computation of the Central States Fund's UVB was the subject of some contention in the district court. Apparently the trustees of the Central States Fund

---

1. By order dated July 29, 1983, the court granted the parties' motion that this case be considered on an expedited basis. Oral argument was heard on August 10, 1983 by the same panel of the court which had previously heard argument in *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247 (7th Cir.1983).

2. The Essex Group, however, after the 1980 closing of Transport and Bohren, continued to contribute to the Central States Fund for certain of its own employees.

considered three different actuarial estimates of UVB ranging from $2.047 billion to $4.108 billion before settling on the figure of $3.576 billion that provided the basis for the claims assessed against the withdrawing companies.

The district court initially addressed the contention of the PBGC that the court should not reach the constitutional issues which the case raised because the MPPAA required the plaintiffs to arbitrate any dispute they had with the Central States Fund before seeking any relief in court. The court rejected this contention, noting that it considered the case to be a "facial challenge" to the MPPAA and that compelling arbitration "would not promote deference to either Congress or the autonomy of the arbitration process." *Transport Motor Express, Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* No. 81 C 4535, slip op. at 10 (N.D.Ill. May 18, 1983).

Turning to the substantive issues in the case, the district court addressed the plaintiffs' allegations that a withdrawal claim based upon an employer's withdrawal from the Central States Fund during the retrospective period violated the due process clause of the fifth amendment. The plaintiffs also alleged a variety of other constitutional deficiencies in the MPPAA and argued that the case presented an "as-applied" constitutional challenge to the MPPAA on a complete factual record. The district court was not persuaded by any of the plaintiffs' contentions. The court followed the analysis developed by this court in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir.1979), *aff'd,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), and concluded that the MPPAA did not unconstitutionally apply retroactive liability. The court did not agree that the case was entirely an as-applied challenge, finding that the plaintiffs' procedural arguments were essentially facial challenges because the plaintiffs had not pursued the arbitration process. Noting that the procedural arguments had been considered and rejected in other cases, the court found that the Act survived constitutional challenge.

## II

"The great gravity and delicacy of constitutional decision-making counsels that federal courts abjure constitutional rulings where a 'dispositive nonconstitutional ground is available.'" *Ruslan Shipping Corp. v. Coscol Petroleum Corp.,* 635 F.2d 648, 650 (7th Cir.1980) *quoting Hagans v. Lavine,* 415 U.S. 528, 547, 94 S.Ct. 1372, 1384, 39 L.Ed.2d 577 (1974). *See also United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982); *Ashwander v. TVA,* 297 U.S. 288, 341, 56 S.Ct. 466, 480, 80 L.Ed. 688 (1936) (Brandeis, J., concurring). In recognition of this principle, we must consider, as a preliminary matter, whether it was proper for the district court to reach the complex constitutional issues raised in this litigation, without determining if a "withdrawal" on the part of appellants indeed occurred. This issue is raised in the case before us because, if no withdrawal under the terms of the MPPAA has occurred, the appellees have no basis for assessing withdrawal liability and appellants' contentions concerning the constitutionality of the MPPAA become moot.

The district court, unfortunately, made no explicit finding with respect to the issue of withdrawal. While that court arguably determined or implicitly assumed that a withdrawal had occurred (since such a determination is a necessary prerequisite to the resolution of the constitutional questions), it is improper to proceed to the important constitutional questions in this case without an explicit determination of this potentially dispositive nonconstitutional issue. The appellants themselves stated in their amended complaint that "No withdrawal from the Central States Fund by any of the plaintiffs has occurred and no withdrawal liability is owed to the Central States Fund by any of the plaintiffs." Amended Complaint ¶ 55. Unlike the situation presented in *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247 (7th Cir. 1983), where employers have actually

withdrawn and *no statutory defenses have been raised*, there is a substantial question in this case concerning the applicability of the MPPAA's withdrawal liability provisions to these appellants. Because, unlike the employers in *Peick*, appellants themselves have raised both statutory and constitutional grounds as defenses against the assessment of withdrawal liability, it would be improper to proceed to important constitutional questions without an explicit rejection of this potentially dispositive nonconstitutional issue.

The situation presented to this court in *Ruslan Shipping Corp. v. Coscol Petroleum Corp.*, 635 F.2d 648 (7th Cir.1980), is similar to this case and our decision in *Ruslan* guides us here. In *Ruslan*, the Ruslan Shipping Corp. ("Ruslan") obtained a writ of attachment against assets of the Coscol Petroleum Corp. ("Coscol"). Coscol moved to dissolve the writ, claiming that both the local admiralty rules and the due process clause entitled it to such dissolution. The district court, without addressing the claim based on the local rule, held the attachment procedure unconstitutional. We reversed, holding that before the district court reached the constitutional issue, it should have adjudicated the potentially dispositive issue under the rule. Similarly, the district court here should not have reached the constitutional issues before ruling on appellants' contention that they were not subject to withdrawal liability under the statute.[3]

In fact, there appear to be at least three different theories based upon the statute which put in question whether there has actually been a "withdrawal" on the part of these appellants. First, there is some dispute as to what entity is the "employer" which has allegedly withdrawn from the Central States Fund. *Amicus curiae,* Pension Benefit Guaranty Corp. ("PBGC"), argues that the Essex Group or the United Technologies Corp., not Transport or Bohren, are the entities which must withdraw before liability can be assessed. Because the Essex Group continues to make contributions to the Central States Fund, the PBGC asserts that no withdrawal has occurred. The PBGC bases its argument upon 29 U.S.C. § 1301(b)(1) which defines "employer" to include all of the businesses which are under common control.[4] *See Pension Benefit Guaranty Corp. v. Ouimet Corp.*, 630 F.2d 4 (1st Cir.1980). Appellants respond by asserting that even if the PBGC is correct, it is likely that at least a "partial withdrawal" has occurred.

Second, the events which precipitated the assessment of withdrawal liability occurred mainly *prior* to April 28, 1980. The record is unclear as to how many covered employees were actually employed by Transport and Bohren after April 28, 1980. This would appear to be an important matter, for the statute defines the date of a complete withdrawal to be the "date of the cessation of the obligation to contribute or the cessation of covered activities," 29 U.S.C. § 1383(e), and it is unclear whether the continued employment of a small number of employees engaged in closing a business would delay the "cessation of covered

---

**3.** We recognize that this conclusion may be viewed as conflicting with the Fourth Circuit's recent decision in *Republic Industries, Inc. v. Teamsters Joint Council No 83 of Virginia Pension Fund,* 718 F.2d 628 (4th Cir.1983). The Fourth Circuit seemed to view the issue, however, as a choice between sending the case to arbitration and allowing a direct constitutional challenge—that is essentially as a matter of exhaustion of remedies. We think the problem is more precisely viewed as involving the propriety of reaching constitutional issues when potentially dispositive nonconstitutional questions are presented. The Supreme Court has expressed a strong preference for avoidance of constitutional questions in such situations and

we do not see how the forum in which the nonconstitutional issues would be resolved is relevant to that preference. *See Hagans v. Lavine,* 415 U.S. 528, 546–47 & n. 12, 94 S.Ct. 1372, 1383–84 & n. 12, 39 L.Ed.2d 577 (1974). *See also United States v. Security Industrial Bank,* 459 U.S. 70, 78, 103 S.Ct. 407, 412, 74 L.Ed.2d 235 (1982).

**4.** "[A]ll employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades or businesses as a single employer." 29 U.S.C. § 1301(b)(1).

activities" beyond the date when the bulk of an employer's operations are terminated.

Third, there is substantial dispute over whether a "partial withdrawal" might have occurred. While it is true, as appellants argue, that even a partial withdrawal may trigger substantial withdrawal liabilities, nothing in the record indicates that it has been finally determined that a partial withdrawal has occurred and that appellants have no remaining nonconstitutional defenses to the liability arising from such a withdrawal. This matter was addressed at oral argument, but counsel for appellants was apparently unwilling to concede all aspects of this issue for all purposes and we think that there is an inadequate basis for us to regard it as so unqualifiedly conceded as to form the basis for a constitutional adjudication.

It is arguable that the record here is sufficient for us to determine whether a withdrawal has taken place, but we believe this is not the case. Instead a fact finder ought to be the first to address this issue.[5] Our concern runs specifically to the question whether a withdrawal has occurred since this issue may be dispositive. (A determination of the *amount* of the claimed liability in the event of withdrawal, on the other hand, would not affect our ability to dispose of the case without reaching the constitutional issue.) Nor do we believe that a delay in final adjudication will result in serious hardship to the parties. In any event, the propriety of delaying any constitutional decision until it can be determined whether appellants have incurred MPPAA liability is clear and outweighs any possible hardship to the parties.

### III

We therefore remand this case for initial consideration of the nonconstitutional issues we have addressed. While, as indicated above, we could conceivably decide the statutory issues on the record before us or request additional submissions on these issues, we think that it is preferable to have these questions addressed, developed and framed by a fact finder before we attempt to resolve these complex matters. *See Ruslan Shipping,* 635 F.2d at 651. The district court must first determine whether the issue of withdrawal is properly a matter required to be arbitrated under the MPPAA's arbitration provisions or whether it is a question which may be decided, under these circumstances and in view of whatever positions are taken by the parties, by the district court. The district court, or the arbitrator, should then determine whether, or what type of, a withdrawal has occurred in the case before us.[6]

REMANDED.

---

**5.** We in no way express any opinion as to the merits of the arguments which have been raised concerning a possible waiver of any statutory defense.

**6.** The district court must, of course, also address any questions which may be presented concerning waiver of arbitration or other statutory defenses. *See* note 5 *supra.*