SPRING BRANCH MINING COMPANY, INC., a corporation; Laramie Mining Company, Inc., a corporation; Korchler Coal Company, a corporation; and Rich Creek Mining Company, Inc., a corporation, Plaintiffs,

v.

UNITED MINE WORKERS OF AMERICA 1950 PENSION TRUST AND 1950 PENSION PLAN; and Joseph P. Connors, Donald E. Pierce, Jr., William Miller, William P. Jordan, and Paul R. Dean, in their capacities as Trustees of the UMWA 1950 Pension Trust and 1950 Pension Plan, Defendants.

Civ. A. No. 2:86–0149.

United States District Court,
S.D. West Virginia,
Charleston Division.

Sept. 30, 1987.

Michael D. Foster, Patricia A. Calore, Jackson & Kelly, Charleston, W. Va., for plaintiffs.

Gary M. Ford, Terrence M. Deneen, Groom and Nordberg, Washington, D.C., Susan Cannon–Ryan, Charleston, W. Va., for defendants.

## MEMORANDUM ORDER

COPENHAVER, District Judge.

This matter is before the court on the cross-motions of the parties for summary judgment.

This action arises under the withdrawal liability provisions of the Multiemployer Pension Plan Amendment Act of 1980 (hereinafter MPPAA). Specifically, the plaintiffs contend that they may not be held liable to the defendants for alleged withdrawal liability in the amount of $1,072,378.79. An arbitrator has held that the plaintiffs are liable in that amount pursuant to the withdrawal liability provisions of the MPPAA. The plaintiffs maintain that the arbitrator has misapplied the statute. In addition, the plaintiffs posit that the withdrawal liability provisions are unconstitutional as applied to the facts of this case. They request that the court vacate the award or, in the alternative, declare the MPPAA unconstitutional as applied to this case. According to the defendants, the arbitrator accurately construed pertinent portions of the MPPAA. The defendants argue that the statute is not unconstitutional as applied to this case.

### I. *Factual Background*

The plaintiffs were engaged in the business of contract mining on behalf of Chafin Coal Company at various times from May, 1976, through November 5, 1982. Employees affiliated with the United Mine Workers of America (hereinafter UMWA) were utilized at each of the mining sites of the plaintiffs. Consequently, each of the plaintiffs was signatory to a collective bargaining agreement with the UMWA during the period when operations were conducted. Rich Creek Mining Company, Inc., which was incorporated on May 12, 1976, was signatory to the 1974 collective bargaining agreement which expired in December of 1977. All of the plaintiffs were signatory to the 1978 collective bargaining agreement which expired in March, 1981. Rich Creek, Spring Branch Mining Company, Inc., and Laramie Mining Company, Inc., but not Korchler Coal Company, were signatory to the 1981 collective bargaining agreement which terminated in September of 1984.

Under the terms of the various collective bargaining agreements, signatory employers were obligated to contribute to the UMWA 1974 Pension Plan. Contributions to the 1974 Plan were based upon hours worked by employees, as well as tons of coal produced by the employer. In addition, signatory employers were required to make contributions, based solely upon tons of coal produced, to the UMWA 1950 Pension Plan. The 1950 Plan covers only miners who retired prior to January 1, 1976, and widows of miners who retired prior to January 1, 1976.

Pursuant to the terms of the contracts between Chafin and the plaintiffs, Chafin agreed to pay the plaintiffs' required tonnage contributions to the UMWA Pension and Benefit Plans. Accordingly, the plaintiffs filed remittance advice forms by which they advised the Pension Plans that their required tonnage payments to the 1950 and 1974 Plans were paid by Chafin. Likewise, Chafin filed remittance advice forms with the Plans. Chafin, by use of the forms, differentiated contributions for tonnage mined by Chafin employees from contributions made on behalf of the plaintiffs. Inasmuch as the plaintiffs directly paid contributions to the 1974 Plan based upon hours of work performed by their employees, they submitted remittance advice forms monthly in connection with these contributions.

During or prior to 1982, Chafin terminated its contract mining agreements with the plaintiffs. Consequently, the plaintiffs ceased to be engaged in the coal mining business. The MPPAA provides for withdrawal liability where the "employer" ceases all covered operations or permanently ceases to have an obligation to contribute to a multiemployer plan. In 1983, the

trustees of the 1950 and 1974 Pension Plans advised the plaintiffs that they would be assessed withdrawal liability. In total, the plaintiffs were assessed $330,389.01 of withdrawal liability respecting the 1974 Pension Plan and $1,250,142.63 withdrawal liability respecting the 1950 Pension Plan. By agreements dated March 30, 1984, the 1974 Pension Plan accepted a lump sum of $290,612.21 as full payment of the withdrawal liability and the 1950 Pension Plan accepted a lump sum of $1,072,387.79 as full payment of the withdrawal liability. Under those agreements, the plaintiffs reserved the right to further contest the propriety of the assessments.

Subsequently, the plaintiffs did contest the propriety of the assessment and the dispute was presented to an arbitrator. The independent arbitrator ruled that the Pension Plans had properly assessed withdrawal liability pursuant to the Employees Retirement Income Security Act of 1974 (hereinafter ERISA), as amended by the MPPAA, 29 U.S.C. §§ 1301–1461. Soon thereafter, the plaintiffs filed the present action. The plaintiffs do not presently contest the assessment made by the 1974 Plan, but continue to argue that the 1950 Plan is not entitled to withdrawal liability.[1]

## II. *History of Private Pension Regulation*

The Employee Retirement Income Security Act, 29 U.S.C. §§ 1001–1381, was enacted by Congress in 1974 to provide comprehensive regulation for private pension plans. ERISA prescribes standards for the funding, management and benefit provisions of these plans. In addition, ERISA establishes a system of pension benefit insurance. Specifically, the Pension Benefit Guaranty Corporation (hereinafter PBGC) was created to administer an insurance program for participants in both single-employer and multi-employer pension plans. For single-employer plans that were in default, ERISA immediately obligated the PBGC to make payments to plan beneficiaries. *Id.* § 1381. With respect to multi-employer plans, ERISA delayed automatic payment of guaranteed benefits until January 1, 1978. Until that date, the PBGC was granted discretion to pay benefits upon the termination of multi-employer plans. *Id.* If the PBGC exercised its discretion and made payments, the contributors to covered multi-employer plans were held liable for their proportional share based upon their contributions to the plan over the previous five years. *Id.* § 1362(b)(2).

Prior to 1978, the PBGC extended coverage to numerous plans. Consequently, "Congress became concerned that a significant number of plans were experiencing extreme financial hardship ..., and that implementation of mandatory guarantees for multi-employer plans might induce several large plans to terminate, thus subjecting the insurance system to liability beyond its means." *Connolly v. Pension Benefit Guaranty Corporation*, 475 U.S. 211, 106 S.Ct. 1018, 1021, 89 L.Ed.2d 166 (1986). Hence, Congress delayed the effective date for mandatory guarantees by eighteen months and commissioned the PBGC to prepare a report. *Id.*

The PBGC's report found, inter alia, "that ERISA did not adequately protect plans from the adverse consequences that resulted when individual employers terminate their participation in, or withdraw from, multiemployer plans." *Id.* The report noted that employer withdrawals reduce the contribution base of a plan, and suggested that withdrawing employers be required to pay whatever share of the plan's unfunded liabilities were attributable to that employer's participation. *Id.* 106 S.Ct. at 1021–22. The PBGC executive director explained, "[w]e think that such withdrawal liability would, first of all, discourage voluntary withdrawals and curtail the current incentives to flee the plan.

---

**1.** The arbitrator found that Spring Branch, Laramie and Korchler are members of a "group of trades or businesses which are under common control" within the meaning of 29 U.S.C. § 1301. Thus, they constitute a single employer for purposes of the withdrawal liability provisions of ERISA. Rich Creek was not a member of the control group. The record does not disclose which portion of the $1,072,387.79 has been assessed against the group of Spring Branch, Laramie and Korchler, or the amount assessed against Rich Creek.

Where such withdrawals nonetheless occur, we think that withdrawal liability would cushion the financial impact on the plan." *Id.* at 1022 (*citing Pension Plan Termination Insurance Issues:* Hearings Before the Subcommittee on Oversight of the House Committee on Ways and Means, 95th Cong., 2d Sess., 23 (1978)).

After extensive discussion, Congress heeded the advice of the PBGC and enacted the MPPAA. The Act requires that an employer withdrawing from a multi-employer pension plan pay a fixed debt to the pension plan calculated as the proportionate share of the plan's unfunded vested benefits. *Id.; see* 29 U.S.C. §§ 1381, 1391.

### III. *Summary of Arguments*

The plaintiffs' claim is divided into two counts. In Count I, the plaintiffs contend that the arbitrator twice misapplied the statute. First, he allegedly erred in classifying the plaintiffs as employers within the meaning of the MPPAA. Second, the plaintiffs purportedly had no obligation to contribute to the 1950 Fund and thus no withdrawal liability was incurred.

In Count II of their complaint, the plaintiffs aver that the withdrawal liability provisions as applied to this case constitute an unconstitutional taking of private property without just compensation and an unconstitutional denial of substantive due process. The arbitrator did not consider the constitutional issues in rendering his award.

The standard of review of an arbitration award under MPPAA is governed by 29 U.S.C. § 1401, which provides that there is a presumption, rebuttable only by a clear preponderance of the evidence, that the factual findings of the arbitrator are correct. *Id.* However, the conclusions of law of the arbitrator are reviewable *de novo* by the district court. *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 641 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). Here, the facts are not in dispute. The sole issues are legal in nature and thus a *de novo* review of the arbitrator's decision is mandated. *Id.*

### IV. *Statutory Claims*

#### A. Definition of Employer

The plaintiffs theorize that they are not employers with respect to the 1950 Pension Plan because none of their employees or former employees are beneficiaries of the Plan. As indicated earlier, the 1950 Plan provides only for retirees and their widows if the retiree ceased employment prior to January 1, 1976. Each of the plaintiffs commenced operations subsequent to this date. The defendants observe that the plaintiffs cite no authority for their proposition. In addition, the defendants assert that precedent and the underlying policy of the MPPAA establish that the plaintiffs are employers for the purpose of assessing withdrawal liability.

Unfortunately, the MPPAA does not contain a definition of employer. However, the parties concur in asserting that Title I of ERISA, which governs the fiduciary, reporting, disclosure and employer contributions requirements of employee benefit plans, may be consulted for guidance. Under Title I of ERISA, "[t]he term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C. § 1002(5). Clearly, this definition does not expressly address the issue presented here. The plaintiffs maintain that the clear indication is that one must have employees participating in the plan in order to be an employer in relation to the plan. However, this interpretation appears to be erroneous. Section 1002(5) defines employers as entities having a relationship with a benefit plan, not as an entity having a relationship with any particular employees or retirees.

The plaintiffs also contend that 29 U.S.C. § 1301(b)(1) of the MPPAA implies that a corporation must have employees who participate in a particular plan in order to be deemed an employer with regard to that plan. Section 1301(b)(1) states that:

> An individual who owns the entire interest in an unincorporated trade or business is treated as his own employer, and

a partnership is treated as the employer of each partner who is an employee within the meaning of section 401(c)(1) of Title 26. For purposes of this subchapter, under regulations prescribed by the corporation, all employees of trades or businesses (whether or not incorporated) which are under common control shall be treated as employed by a single employer and all such trades or businesses as a single employer. The regulations prescribed under the preceding sentence shall be consistent and coextensive with regulations prescribed for similar purpose of the Secretary of the Treasury under section 413(c) of Title 26.

Contrary to the contention of the plaintiff, § 1301(b)(1) sheds no light on the issue before the court. Rather, the definition is relevant in determining the applicability of single employer plans, and in determining the entity which is liable in the event that employers contributing to a multi-employer plan are related.

The only authority cited by the parties or located by the court dealing with the issue presented here is *Warrior Coal Co., Inc. v. Connors,* 649 F.Supp. 1090 (W.D.Va.1986). Warrior Coal Co. was formed in 1981 to conduct contract mining for Clinchfield Coal Company. Warrior became signatory to the National Bituminous Coal Wage Agreement of 1981 with the UMWA. By virtue of the Agreement, Warrior incurred an obligation to contribute to the 1950 and 1974 Pension Plans. Warrior paid all contributions due during its period of operation. Due to conditions making strip mining prohibitively expensive, Warrior ceased operations in July of 1984. *Warrior Coal* at 1091.

After Warrior ceased operations, the Pension Plans assessed Warrior withdrawal liability. Warrior contested withdrawal liability to the 1950 Pension Plan, alleging that it was not an employer with respect to that Plan. After initially finding that Warrior could present its statutory interpretation claim for resolution without having first submitted the issue to arbitration, the court addressed the issue of whether Warrior was an employer with respect to the 1950 Plan. Warrior argued that it was not an employer because it had no employees or former employees covered by the 1950 Plan. *Warrior Coal* at 1094–95.

The court rejected the position advanced by Warrior Coal, stating:

> Neither the Congressional Record nor the text of MPPAA supports Warrior's claim. First, the MPPAA does not contain any reference that "employer" is defined in this unprecedented manner. It seems apparent that if Congress wished "employer" defined in this novel way, Congress would have made appropriate indications. This court should accord the language in Congress' legislation its ordinary meaning absent some indication to the contrary. *National Labor Relations Board v. Coca Cola Co.,* 350 U.S. 264, 268–69 [76 S.Ct. 383, 385–86, 100 L.Ed. 285] (1956); *United States v. Fordyce,* 192 F.Supp. 93, 94 (S.D.Calif. 1961); *Reliable Volkswagen Sales & Service Co. v. World–Wide Automobile Corp.,* 216 F.Supp. 141, 143 (D.N.J.1963). Additionally, Congress proceeded to implement a method of computing withdrawal liability which in its estimation would result in each employer paying its fair share of a plan's unfunded liabilities. 29 U.S.C. § 1391. The complex method of calculating withdrawal liability evidences Congress' intention that use of § 1391 to compute the withdrawal liability would achieve fairness.

*Warrior Coal* at 1096. The court proceeded to note that the 1950 Pension Plan is unable to associate all unfunded liability with a current contributing employer. Thus, MPPAA was intended to impose upon a withdrawing employer "a responsibility to contribute its fair share of *all unfunded liabilities* not just its fair share as represented by the liability associated with its employees." *Id.* at 1097.[2]

---

2. The plaintiff in *Warrior Coal* also maintained that requiring withdrawal payments to the 1950 Plan would violate its rights under the due process clause. The district court did not consider the constitutional challenge in that a further factual record needed to be developed in arbitration. Inasmuch as the facts relevant to the

The legislative history, though sparse and inconclusive as to the present issue, tends to support the interpretation of the defendants. Senator Randolph of West Virginia emphasized that the 1950 Pension Plan was funded by tonnage royalties paid by companies employing active workers. Consequently, the companies maintaining the fund had little incentive to continue making contributions. *See* 126 Cong.Rec. S10105 (daily ed. July 29, 1980). The withdrawal liability provisions were designed to assess withdrawal liability based upon the past contributions made by an employer in order to insure the solvency of the Fund. *Id.; see also Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund*, 718 F.2d 628, 639 (4th Cir.1983), *cert. denied*, 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). The policy of the MPPAA can best be effectuated if the term "employer" is broadly construed.

■ Based upon the language in the statute, the limited case law, and the policy of the withdrawal provisions, it is concluded that the arbitrator was correct in holding that the plaintiffs are employers within the meaning of the withdrawal liability provisions of the MPPAA.

B. Contributions to the 1950 Plan

With regard to the statutory interpretation aspect of the claim, the plaintiffs also posit that they are not subject to withdrawal liability because they had no obligation to contribute to the 1950 Pension Plan. The plaintiffs explain that:

> It is the position of the plaintiffs that as contract miners, the National Bituminous Coal Wage Agreements did not obligate them to contribute the tonnage royalty required to the 1950 Plan since under the terms of those agreements, only one with an economic interest in the coal is required to contribute based upon tons mined.

Memorandum in Support of the Plaintiffs' Motion for Summary Judgment at 26. According to the plaintiffs, they had no economic interest in the coal mined under the contracts with Chafin and simply provided labor to mine the coal. The National Bituminous Coal Wage Agreements require that the coal be produced for use or for sale in order to subject the plaintiff to the tonnage royalty under the 1950 Pension Plan.[3]

■ The plaintiffs' theory is not novel. Indeed, it has been espoused by other contract mining companies and consistently rejected. *See Combs v. Maben Energy Corp.*, 637 F.Supp. 954 (S.D.W.Va.1986); *Combs v. Western Coal Corp.*, 611 F.Supp. 917, 922 n. 2 (D.D.C.1985); *Connors v. B & W Coal Co.*, 646 F.Supp. 164 (D.D.C.1986). The case of *Connors v. B & W Coal Co.* is precisely on point, holding that a contract mining company had an obligation to contribute to the 1950 Pension Plan and was subject to withdrawal liability, even though its lessor had agreed to pay tonnage contributions to the 1950 Pension Plan on the contract miner's behalf. Moreover, the plaintiffs fail to cite any authority in support of their argument. In view of the well-reasoned decisions to the contrary, the argument of the plaintiffs that they were not contributors to the 1950 Plan and are therefore not liable for withdrawal payments is deemed without merit.

V. *Constitutional Challenges*

It is well-settled that the MPPAA is not unconstitutional on its face. *See Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986) (the withdrawal liability provisions of the MPPAA do not violate the Taking Clause of the Fifth Amendment); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984) (retroactive application of withdrawal liability provisions do not violate the due process clause); *Republic*

---

statutory claim were clear, this legal issue could be decided by the court in the first instance.

**3.** The plaintiffs do not take the position that the contract between Chafin and the plaintiffs su-

percedes any obligation under the Wage Agreements. Rather, they argue that no obligation to make contributions arose under the Wage Agreements with the UMWA.

*Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984) (MPPAA does not unconstitutionally impair private contract rights). However, the plaintiffs maintain that the withdrawal provisions are unconstitutional as applied to them under the Due Process Clause and the Taking Clause of the Fifth Amendment. The plaintiffs claim that "No court has considered a constitutional challenge to MPPAA in connection with a multiemployer plan in which the assessed company had no employees who ever participated in the plan." Plaintiffs' Response to Defendants' Motion for Summary Judgment at 6.

## A. Taking Clause

The Supreme Court addressed the issue of whether the withdrawal liability provisions of the MPPAA are valid under the Taking Clause of the Fifth Amendment that forbids the taking of private property for public use without just compensation in *Connolly v. Pension Benefit Guaranty Corp.,* 475 U.S. 211, 106 S.Ct. 1018, 89 L.Ed.2d 166 (1986). After reviewing the legislative history and policy of the withdrawal liability provisions, the Court turned to the case law interpreting the Taking Clause. Initially, the Court noted that "it cannot be said that the Taking Clause is violated whenever legislation requires one person to use his or her assets for the benefit of another." *Id.* 106 S.Ct. at 1025 (*citing Usery v. Turner Elkhorn Mining Co.,* 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). Moreover, "legislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations .... This is true even though the effect of the legislation is to impose a new duty or liability based on past acts." *Connolly,* 106 S.Ct. at 1025 (*quoting Usery,* 428 U.S. at 15–16, 96 S.Ct. at 2892–93).

In *Connolly,* the contributors to the pension plan argued that the terms of the contract creating the pension plan protected the contributing employers from any liability beyond the specified contributions to which it had agreed. The Court summarily dismissed the argument, stating:

> "*Contracts, however express, cannot fetter the constitutional authority of Congress.* Contracts may create rights of property, but when contracts deal with a subject matter which lies within the control of Congress, they have a congenital infirmity. Parties cannot remove their transactions from the reach of dominant constitutional power by making contracts about them."

*Id.* at 1025 (*citing Norman v. Baltimore & Ohio R. Co.,* 294 U.S. 240, 307–08, 55 S.Ct. 407, 415–16, 79 L.Ed. 885 (1935)). Regulation which destroys existing contract rights is not always an illegal taking. *Id.*

■ There is no set formula for identifying a "taking" forbidden by the Fifth Amendment. Rather, the court must rely on an ad hoc factual inquiry into the circumstances of each case. However, three factors are of particular significance:

> (1) the economic impact of the regulation on the claimant; (2) the extent to which the regulation has interfered with distinct investment-backed expectations; and (3) the character of the governmental action.

*Id.* at 1026 (*quoting Penn Central Transportation Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978)).

■ Through the MPPAA withdrawal liability provisions, the government does not "physically invade or permanently appropriate any of the employer's assets for its own use." *Id.* Instead, the MPPAA "adjusts the benefits and burdens of economic life to promote the common good." *Id.* Thus, the character of the action weighs in favor of a conclusion that the withdrawal liability provisions do not constitute a taking mandating government compensation. *Id.*

The Court recognized that the economic impact of the withdrawal liability provisions could be harsh. However, the Court noted that there are provisions in the MPPAA which moderate the impact of the withdrawal liability provisions on an individual employer's liability. The Court stated: "There is nothing to show that the

withdrawal liability actually imposed on an employer will always be out of proportion to its experience with the plan ..." *Id.* at 1026–27. This statement suggests that inequitable results in individual cases may not necessarily weigh significantly in the Court's Taking Clause analysis.

The final inquiry undertaken by the Court is whether the MPPAA has "interfered with reasonable investment-backed expectations." According to the Court, pensions plans have been heavily regulated since ERISA was enacted in 1974. Further, prior to the enactment of MPPAA in 1980, prudent employers "had more than sufficient notice not only that pension plans were currently regulated, but also that withdrawal itself might trigger additional financial obligations.... Those who do business in the regulated field cannot object if the legislative scheme is buttressed by subsequent amendments to achieve the legislative end." *Id.* at 1027.

The Court observed that the purpose of the Taking Clause is "to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.* at 1027 (*quoting Armstrong v. United States*, 364 U.S. 40, 49, 80 S.Ct. 1563, 1569, 4 L.Ed.2d 1554 (1960)). In conclusion, the Court stated, "We are far from persuaded that fairness and justice require the public, rather than the withdrawing employers and other parties to pension plan agreements, to shoulder the responsibility for rescuing plans that are in financial trouble." *Id.*

The *Connolly* opinion would, at first glance, appear to dispose of the argument that the withdrawal liability provisions of the MPPAA violate the Taking Clause. However, the concurring opinion authored by Justice O'Connor and joined by Justice Powell suggests that in some instances the application of the withdrawal provisions may violate either the Taking Clause or the Due Process Clause of the Fifth Amendment. Justice O'Connor opined that the withdrawal liability provisions may be arbitrary and irrational in the absence of any connection between the conduct of the employer and some detriment to the employee. Justice O'Connor was troubled by the imposition of liability "on contributing employers for unfunded benefits that accrued in the past under a pension plan whether or not the employers had agreed to ensure that benefits would be fully funded." *Id.* at 1028 (Justice O'Connor concurring).

The ERISA statute distinguishes between two types of retirement benefit plans: "defined benefit plan[s]" and "defined contribution plan[s]." *See* 29 U.S.C. § 1002(34), (35). Employers are subject to withdrawal liability under the defined benefit plans but not under the defined contribution plans. Defined contribution plans do not specify the benefit to be paid, but instead establish an individual account for each participant to which employer contributions are made. "[U]nder such plans, by definition, there can never be an insufficiency of funds in the plan to cover promised benefits." *Connolly*, 106 S.Ct. at 1029 (Justice O'Connor concurring). By contrast, with defined benefit plans, there is always a possibility that the plan assets would fall short of the present value of vested plan benefits. The withdrawal liability provisions were designed to prevent such shortfalls.

According to Justice O'Connor, pension plans which are established through collective bargaining are often hybrids between the defined benefit plan and the defined contribution plan. Unlike typical defined benefit plans which call for variable employer contributions and provide for fixed benefits, most pension plans created through collective bargaining require employers to contribute at a fixed rate while providing for defined benefits. In other words:

> Traditionally, the multiemployer plan or the bargaining agreement have limited the employer's contractual obligation to contribute at the fixed rate, whether or not the contributions were sufficient to provide the benefits established by the joint board or the collectively bargained agreement.

*Id.* at 1030 (*citing* PBGC—Multiemployer Study Requirement by P.L. 95–214 (1978) p. 22).

Under these hybrid plans, the trustees of the plan, rather than the contributing employers, are usually responsible for determining how retirement benefits are to be distributed. Justice O'Connor expressed concern that under the withdrawal liability provisions, the employers contributing to these hybrid plans will be liable "even where withdrawal occurs as a result of events over which an employer has no control, and even though experience gains can still ordinarily be used to increase benefits." *Id.* at 1031.

The possible arbitrariness of imposing withdrawal liability is heightened where the withdrawing employer had no say whatever in establishing critical features of the plan. *Id.* at 1032. Justice O'Connor suggested that the more discretion the plan's trustees have in fixing benefits, the more unfair it is to assess withdrawal liability as to contributing employers. *Id.*

The Fourth Circuit addressed the Taking Clause argument briefly in the case of *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia Pension Fund,* 718 F.2d 628, 642–43 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984). The Fourth Circuit found that the withdrawal liability provisions merely shifted the economic burdens and benefits of economic life and thus do not constitute compensable takings when invoked. *Id.* Every other circuit to consider the question has held that the withdrawal liability provisions do not violate the Taking Clause. *See, e.g., Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Industry Pension Fund,* 762 F.2d 1124 (1st Cir.1984), *modified on other grounds,* 762 F.2d 1137 (1st Cir.1985) (en banc); *Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Thompson Building Materials, Inc.,* 749 F.2d 1396 (9th Cir.1984), *cert. denied,* 471 U.S. 1054, 105 S.Ct. 2116, 85 L.Ed.2d 481 (1985); *Terson Co., Inc. v. Bakery Drivers and Salesmen Local 194,* 739 F.2d 118 (3d Cir.1984); *Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984); *Dorn's Transportation, Inc. v. I.A.M. National Pension Fund, Benefit Plan A,* 578 F.Supp. 1222 (D.D.C.1984), *aff'd without opinion,* 753 F.2d 166 (D.C.Cir.1985).

In addition, it has been specifically held that the withdrawal liability provisions are constitutional as applied to withdrawing employers and the 1950 Pension Plan. *See Calvert & Youngblood Coal Co. v. United Mine Workers of America 1950 Pension Trust,* 6 E.B.C. 1106, 1110–12 (N.D.Ala. 1985) [available on WESTLAW, 1985 WL 9436]. In *Calvert & Youngblood,* the withdrawal liability assessed was held constitutional even though in excess of the operator's net worth. *Id.* at 1112. Notably, only one of the withdrawing employer's former employees was eligible for retirement benefits under the 1950 Plan.

Here, two of the three factors of particular significance in Taking Clause cases weigh in favor of upholding the constitutionality of the MPPAA. For the reasons discussed in *Connolly,* the plaintiffs should have realized the potential for further regulation of pension plans. Thus, the enactment of the MPPAA in 1980 did not interfere with distinct investment-backed expectations. *Connolly,* 106 S.Ct. at 1027. Moreover, the character of the government action, an adjustment of "the benefits and burdens of economic life to promote the common good," militates in favor of upholding the MPPAA. *Id.* at 1026.

The most troublesome factor would appear to be the economic impact of the withdrawal liability provisions. None of the mitigating provisions noted in *Connolly* apply to the present case. However, as observed earlier, the Court indicated that the economic impact factor should be considered on a wider scale than a case by case basis. *Id.* at 1026–27. Justices O'Connor and Powell, on the other hand, felt that the economic impact of the MPPAA could be overly harsh, particularly as applied to contributions to hybrid pension plans such as the 1950 Plan.

The plaintiffs are quite accurate in claiming that all of the cases rejecting the challenge of the Taking Clause are distinguishable because they do not involve a withdrawing company which had no employees who ever participated in the Plan. However, the language in the cases is broad and, other than Justice O'Connor's concurring opinion, there is no authority that the Taking Clause may be violated in certain cases under the MPPAA. A consideration of the three factors enunciated in *Connolly* compels a finding that the application of the withdrawal liability provisions of MPPAA does not violate the Taking Clause. In addition, the Due Process Clause may be better suited than the Taking Clause to deal with alleged inequities in particular cases. *See, e.g., Connolly*, 106 S.Ct. at 1026–27 (suggesting that the weight of the three factors considered under the Taking Clause analysis would not vary significantly from case to case under the MPPAA).

B. Due Process Clause

In *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.*, 467 U.S. 717, 104 S.Ct. 2709, 81 L.Ed.2d 601 (1984), the Supreme Court held that the retroactive application of the withdrawal liability provisions of the MPPAA did not violate the Due Process Clause.[4] The Court described the standard for evaluating Due Process attacks as follows:

It is by now well established that legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way.

*Id.* at 729, 104 S.Ct. at 2717 (*citing Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 96 S.Ct. 2882, 49 L.Ed.2d 752 (1976)). The *Gray* case does not address the issue of whether in a particular case the withdrawal liability provisions could be unconstitutional as applied.

Although the Court in *Gray* did not explicitly decide the constitutionality of the prospective application of the MPPAA's withdrawal liability provisions, it did state in a footnote:

At least three Courts of Appeals, as well as numerous District Courts, have concluded that retroactive application of the MPPAA's withdrawal liability provisions satisfies constitutional standards. See, *e.g., Textile Workers Pension Fund v. Standard Dye & Finishing Co.*, 725 F.2d 843 (CA2 1984); *Peick v. Pension Benefit Guaranty Corp.*, 724 F.2d 1247 (CA7 1983), cert. pending, No. 83–1246 [cert. denied 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984)]; *Republic Industries, Inc. v. Teamsters Joint Council*, 718 F.2d 628 (CA4 1983), cert. pending, No. 83–541 [cert. denied 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855].

The prospective application of the MPPAA's withdrawal liability provisions has also been the subject of extensive nationwide litigation. All of the Courts of Appeals addressing the various constitutional challenges raised in those cases, however, have upheld the statute. See, *e.g., The Washington Star Co. v. International Typographical Union Negotiated Pension Plan*, 235 U.S.App.D.C. 1, 729 F.2d 1502 (1984); *Peick v. Pension Benefit Guaranty Corp., supra; Republic Industries, Inc. v. Teamsters Joint Council, supra.* Because these issues were not addressed by the Court of Appeals, cf. n. 5, *supra,* and are not actively pursued by the parties before this Court, we assume for purposes of our decision in these cases that the prospective effects of the Act satisfy constitutional standards.

*Id.* 467 U.S. at 728, note 7, 104 S.Ct. at 2717, note 7.

In *Republic Industries, Inc. v. Teamsters Joint Council No. 83 of Virginia*

---

**4.** Under the MPPAA, the withdrawal liability provisions were applied to employers withdrawing from pension plans during a five-month period prior to the statute's enactment. In that the plaintiffs in the present case withdrew subsequent to the enactment of the MPPAA, the retroactivity aspect of the statute is not under consideration here.

*Pension Fund,* 718 F.2d 628 (4th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3553, 82 L.Ed.2d 855 (1984), the Fourth Circuit held that the retroactive withdrawal liability provisions of the MPPAA did not violate the Due Process Clause. A statute regulating economic benefits and burdens does not violate the Due Process Clause if it is a rational means to achieve a legitimate legislative purpose. *Id.* at 636. In *Republic Industries,* the court adopted an approach of analysis articulated by the Seventh Circuit in *Nachman Corp. v. Pension Benefit Guaranty Corp.,* 592 F.2d 947 (7th Cir. 1979), *aff'd on stat. grounds,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980). In *Nachman,* the Seventh Circuit stated:

> Rationality must be determined by a comparison of the problem to be remedied with the nature and scope of the burden imposed to remedy that problem. In evaluating the nature and scope of the burden, it is appropriate to consider the reliance interests of the parties affected, ... whether the impairment of the private interest is effected in an area previously subjected to regulatory control, ... the equities of imposing the legislative burdens, ... and the inclusion of statutory provisions designed to limit and moderate the impact of the burdens.

*Id.* at 960.

There is no doubt that the employees' reliance on ultimate realization of their vested benefits is heavily weighed. *See Republic Industries,* 718 F.2d at 638. Conversely, an employer's reliance on its unqualified right to withdraw from a multiemployer pension plan is not as weighty. *Id.* The Fourth Circuit noted that at the time that Republic Industries withdrew from the pension plan, bills imposing withdrawal liability had already been passed in both Houses of Congress. Thus, Republic Industries had fair notice of its potential liability. *Id.*

The Fourth Circuit concluded that "the factor of prior regulation is fully satisfied." Significantly, since the enactment of ERISA in 1974, termination of single employer pension funds has been fully regulated. *Id.*

The third *Nachman* factor to be considered was the equities of imposing legislative burdens. According to the Fourth Circuit, this factor weighed heavily in favor of the employees. In this regard, the Fourth Circuit stated:

> We say only that Congress was met with the need to ensure financial stability of multiemployer pension plans when withdrawals occurred, as well as to create disincentives for employers to abandon such plans. Confronted with the choice of who should bear the economic burden of unfunded pension liability left by withdrawing employers, *Congress did not in our view act inequitably in requiring that employers who received the full benefit of their employees' services should bear the cost rather than the employees who provided their services on the actual or implied promise that they would ultimately enjoy their vested, accrued pension benefits.*

*See Republic Industries,* 718 F.2d at 638–39 (emphasis supplied).

Finally, the court observed that the substantial impact of withdrawal liability is ameliorated by certain provisions of the MPPAA. For example, a mandatory de minimis exemption excuses all liability under $50,000, 29 U.S.C. § 1389, and the trustees of the pension plan may grant a higher exemption. *Id.* In addition, withdrawal liability may be paid over a period of time and may be reduced if the employer withdraws because it liquidates or dissolves its business. 29 U.S.C. §§ 1399–1405. Similarly, withdrawal liability is not assessed where the cessation of operations results from a bona fide sale of assets to an unrelated party which assumes the obligation to continue contributions. *Id.* § 1384. With respect to certain industries, an employer is excused from withdrawal liability if the contribution base of the plan will not be harmed by the withdrawal. *Id.* § 1398(2).

Inasmuch as each of the *Nachman* factors, as weighed by the Fourth Circuit, favored a finding that the retroactive application of the withdrawal liability provisions of the MPPAA were constitutional, the

Fourth Circuit rejected the Due Process challenge.

The significance of the *Nachman* analysis was undermined to some extent by the Supreme Court in *Gray*, when it noted:

> The court in *Nachman* developed this four-part test for reviewing the constitutionality of retroactive legislation under the Fifth Amendment's Due Process Clause primarily by relying upon this Court's decisions in *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234 [98 S.Ct. 2716, 57 L.Ed.2d 727] (1978), and *Railroad Retirement Board v. Alton R. Co.*, 295 U.S. 330 [55 S.Ct. 758, 79 L.Ed. 1468] (1935). For reasons explained below, however, we do not believe that these cases control judicial review of retroactive federal legislation affecting economic benefits and burdens. See *infra*, at 732–734 [104 S.Ct. at 2719–2720]. We therefore reject the constitutional underpinnings of the analysis employed by the Court of Appeals in *Nachman*, although we have no occasion to consider whether the factors mentioned by that court might in some circumstances be relevant in determining whether retroactive legislation is rational. Cf. *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 367–368, and n. 12 [100 S.Ct. 1723, 1729–1730, and n. 12, 64 L.Ed.2d 354] (1980) (explicitly limiting our review to the statutory question presented).

*Gray*, 467 U.S. at 727, n. 6, 104 S.Ct. at 2716, n. 6. Thus, the *Nachman* factors, though apparently relevant to a rationality standard, should not be viewed as comprehensive.

The defendants note that the withdrawal liability provisions of the MPPAA have been approved with respect to the 1950 Plan. *See, e.g., Calvert & Youngblood Coal Co. v. United Mine Workers of America 1950 Pension Trust*, 6 E.B.C. 1106 (N.D.Ala.1985). In *Calvert & Youngblood*, the court recognized that certain provisions of the MPPAA treat the 1950 Plan and a few others less favorably than pension plans in general. For example, 29 U.S.C. § 1405, which limits the withdrawal liability of an employer which sells all or substantially all of its assets to an unrelated third party, is not applicable to the 1950 Plan. *See* 29 U.S.C. § 1391(d)(2). However, the court concluded that the distinctions were rational because the 1950 Plan was historically financially weak and unstable. *Id.* at 1111 (stating: "Testimony before Congress indicated that any limitation on liability would threaten the stability of [the 1950 Plan]").

The case of *Calvert & Youngblood Coal Co. v. United Mine Workers of America 1950 Pension Trust*, 6 E.B.C. 1106 (N.D. Ala.1985), is from a factual standpoint rather similar to the case at bar. In *Calvert & Youngblood*, the plaintiff coal company ceased its mining operations due to poor mining conditions and a sagging market. Consequently, it was assessed withdrawal liability in excess of one million dollars. The plaintiff claimed that the withdrawal liability provisions of the MPPAA violated the Taking Clause and the Due Process Clause. Even though the assessed liability "substantially exceeded" the plaintiff's net worth, the court held in favor of the defendant 1950 Plan.

In *Calvert & Youngblood*, the plaintiff employer had only one former union employee who was eligible for benefits under the 1950 Plan. Nevertheless, the court upheld the MPPAA against the substantive due process attack, stating:

> The foregoing cases reveal that the law on this point has been sufficiently litigated to become clear. Since this court is bound to follow the law, it must therefore hold that the withdrawal liability provisions of MPPAA do not violate substantive due process.

*Id.* (citations omitted). Notably, the *Calvert & Youngblood* case was decided prior to the *Connolly* decision. Hence, the court did not have the concurring opinion of Justice O'Connor to cast a shadow upon the issue.

In arguing that the withdrawal liability provisions of the MPPAA abridge substantive due process, the plaintiffs rely heavily on *Railroad Retirement Board v. Alton Railroad Co.*, 295 U.S. 330, 55 S.Ct. 758, 79 L.Ed. 1468 (1935). In *Alton*, legislation

that established a compulsory retirement program for railroad employees was challenged. The program was funded through employer and employee contributions based upon wages paid to employees. The legislation created three classes of beneficiaries. The first consisted of those who were employed by any carrier on the date that legislation was enacted. The second consisted of those who subsequently became employees of any covered carrier. The third consisted of those whose services were terminated within one year of the date of passage of the legislation.

With respect to the first class, the Supreme Court held the legislation arbitrary and irrational and therefore violative of the Due Process Clause because it permitted many railroad employees to qualify for a pension, even though they had never contributed to the program. Similarly, the legislation was irrational and arbitrary as to the second class, both because it allowed persons to qualify for a pension without regard to length of service and because it required inclusion of service before passage of the legislation in the event an employee resumed employment with a railroad after passage of the legislation. Finally, with respect to the third class, the Court found the legislation arbitrary and irrational because it materially altered contractual obligations which had come to a close prior to passage of the legislation. *Id.* at 349, 55 S.Ct. at 762.

In *Gray*, the Court expressed doubts about the continuing validity of the *Alton* decision. Since the *Alton* decision, there have been substantial changes in judicial review of economic legislation. *Gray*, 467 U.S. at 733, 104 S.Ct. at 2719. Several courts of appeals have rejected *Alton* as precedent in considering due process attacks on the MPPAA. *See, e.g., Peick v. Pension Benefit Guaranty Corp.,* 724 F.2d 1247 (7th Cir.1983); *Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1509 (D.C.Cir.1984). As stated by the court in *Calvert & Youngblood:*

> Thus, although *Railroad Retirement Board* has not been overruled, courts have so consistently questioned its validi-

ty and refused to follow it that, in effect, the case can furnish no basis for this court to hold in favor of Calvert & Youngblood.

*Calvert & Youngblood,* 6 E.B.C. at 1110. Moreover, in *Gray,* the Court distinguished the statute considered in *Alton* from the MPPAA as follows:

> Unlike the statute in *Alton,* which created pensions for employees who had been fully compensated while working for the railroads, the MPPAA merely requires a withdrawing employer to compensate a pension plan for benefits that have already vested with the employees at the time of the employer's withdrawal.

*Gray,* 467 U.S. at 733–34, 104 S.Ct. at 2719–20. For these reasons, the *Alton* decision is not of much significance in the due process analysis.

Plainly, some of the concerns expressed by Justices O'Connor and Powell in their concurring opinion in *Connolly* are present here. In that none of the plaintiffs have employees or former employees covered by the 1950 Plan, it may be that the beneficiaries of the 1950 Plan could not have reasonably relied upon the plaintiffs to fund the plan even upon withdrawal. *See Connolly,* 106 S.Ct. at 1028 (concurring opinion). Further, the 1950 Plan is the hybrid type of plan discussed in the concurring opinion. Prior to enactment of the MPPAA, the only liability was to make designated contributions. Notably, the type and amounts of benefits to be paid were left to the discretion of the Plan's trustees. *Calvert & Youngblood Coal Co. v. United Mine Workers of America 1950 Pension Trust,* 6 E.B.C. 1109 (N.D.Ala. 1985).

The plaintiffs argue that the withdrawal liability provisions are especially noxious as applied to them because they had absolutely "no say whatever in establishing the critical features of the plan that determine the level of benefits and the value of those benefits." *See Connolly,* 106 S.Ct. at 1031. Inasmuch as the plaintiffs only became obligated to the 1950 Plan subsequent to its formation, there is some merit

to their argument. Moreover, the substantial withdrawal liability assessed clearly exceeds the present value of all benefits accrued by former employees of the plaintiffs. *See Id.*

The fact that the MPPAA was enacted in a field previously heavily regulated under ERISA is a factor weighing to some degree in favor of the position of the defendants. On the other hand, the ameliorating provisions of the MPPAA do not appear to be particularly relevant in that none of them apply under the facts presented here. *Cf. Republic Industries,* 718 F.2d at 639.

The plaintiffs emphasize that the MPPAA treats employers contributing to the 1950 Plan less favorably than other employers. Specifically, § 1391(d)(2) makes provisions limiting withdrawal liability to a percentage of net worth inapplicable to the 1950 Plan and a few others. 29 U.S.C. § 1391(d)(2). In addition, the provisions limiting withdrawal liability where a contributor sells all or substantially all of its assets is inapplicable to the 1950 Plan. *Id.*[5] Nevertheless, there is no allegation that any of the provisions limiting withdrawal liability would have been applicable here but for § 1391(d)(2). Thus, the existence of § 1391(d)(2) is not of great moment in determining the constitutionality of the MPPAA as applied to the facts of this case. Here, "there is nothing to show that the withdrawal liability imposed on [the plaintiffs] ... [is] out of proportion to [their] experience with the plan." *Connolly,* 106 S.Ct. at 1026-27.

The 1950 Plan is rather unique in the scope of its coverage. In most industries, retired and active workers are covered by the same plan, and this fact discourages employer withdrawals. However, in the coal industry, the 1950 Plan covers only retired employees. This arrangement is only possible if current employers signatory to the collective bargaining agreements agree to assist in funding the 1950 Plan. Consequently, "many of [the 1950 Plan's] beneficiaries were never employed by the companies currently bearing the funding burden." *The Multiemployer Pension Plan Amendment Act of 1979; Hearings Before the Committee on Labor and Human Resources, United States Senate,* 96th Cong., 1st Sess. (1979) at 594 (BCOA testimony). Hence, employers had an economic motivation to withdraw from the fund. The withdrawal liability serves as a means to both deter withdrawal and to make the employer liable for any damage caused by the withdrawal. *Calvert & Youngblood,* 6 E.B.C. at 1110 (citing cases).

■ By their very nature, multiemployer plans require a particular employer to make contributions which will fund benefits paid to retirees who had never worked for that employer. However, generally the contributing employer has some former employees who are beneficiaries of the plan. Here, that is not the case. Thus, requiring the plaintiffs to make withdrawal payments does seem harsh. Yet, it is clear that the purpose of the withdrawal liability provisions, to insure full funding of vested benefits and to discourage withdrawals by contributors, is both laudatory and legitimate. *See Gray,* 467 U.S. 717, 104 S.Ct. 2709; *Connolly,* 106 S.Ct. 1018. In view of the unique nature of the 1950 Plan and its history of financial instability, together

---

5. Section 1391(d) of Title 29 provides:
   (1) The method of calculating an employer's allocable share of unfunded vested benefits set forth in subsection (c)(3) of this section shall be the method for calculating an employer's allocable share of unfunded vested benefits under a plan to which section 404(c) of Title 26, or a continuation of such a plan, applies, unless the plan is amended to adopt another method authorized under subsection (b) of (c) of this section.
   (2) Sections 1384, 1389, 1399(c)(1)(B), and 1405 of this title shall not apply with respect to the withdrawal of an employer from a plan described in paragraph (1) unless the plan is amended to provide that any of such sections apply.
   Apparently, the only 404(c) plans under the Tax Code are the 1950 and 1974 Plans and the plan applicable to the anthracite coal industry. Section 1384 deals with the exemption when there is a sale of assets; section 1389 provides for a certain de minimis exemption; section 1399(c)(1)(B) provides for a limited exemption for certain long-time contributors; and section 1405 establishes the exemption based on percentage of net worth.

with the undertaking of the plaintiffs under the collective bargaining agreements to contribute to the 1950 Plan at a time when ERISA was in effect and MPPAA under consideration, it cannot be said that the withdrawal liability provisions are irrational as applied to the plaintiffs. *See Calvert & Youngblood,* 6 E.B.C. at 1106. Accordingly, the economic regulations of the MPPAA must be held valid against an attack under the due process clause.

For the reasons given above, it is hereby ORDERED that:

1. The motion of the plaintiffs for summary judgment be, and the same hereby is, denied; and

2. The motion of the defendants for summary judgment be, and the same hereby is, granted.

### JUDGMENT ORDER

In accordance with the memorandum order this day entered in the above-styled civil action, it is ORDERED that:

1. Summary judgment be, and the same hereby is, granted in favor of the defendants and against the plaintiffs;

2. The arbitration award in AAA Case No. 16–621–0003–846 be, and the same hereby is, affirmed, and judgment for the defendants in the amounts found due by the arbitrator and stipulated to by the parties be, and the same hereby is, granted; and

3. The plaintiffs be, and they hereby are, denied all relief and the defendants shall recover their costs of action.

There being nothing further remaining in this action, it is ORDERED that this case be, and the same hereby is, dismissed with prejudice and stricken from the docket of the court.